

**ATTORNEY FOR APPELLANT**

Daniel G. Foote
Indianapolis, Indiana

**ATTORNEYS FOR APPELLEE**

Curtis T. Hill, Jr.
Attorney General of Indiana

Marjorie Newell
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of: K.S. (Minor Child)

*Child in Need of Services*;

J.J. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

June 29, 2017

Court of Appeals Case No.
49A02-1701-JC-38

Appeal from the Marion Superior Court

The Honorable Marilyn Moores, Judge
The Honorable Rosanne Ang, Magistrate

Trial Court Cause No.
49D09-1606-2022

**Pyle, Judge.**

## Statement of the Case

J.J. ("Mother") appeals the juvenile court's order adjudicating her son, K.S. ("K.S."), to be a Child in Need of Services ("CHINS"). Mother argues that the Department of Child Services ("DCS") failed to prove by a preponderance of the evidence that K.S.'s physical or mental condition was seriously impaired or seriously endangered as a result of Mother's inability, refusal, or neglect to supply K.S. with necessary food, clothing, shelter, medical care, education, or supervision. Finding that DCS failed to present evidence, let alone sufficient evidence, that K.S.'s physical or mental condition was seriously impaired or seriously endangered and that Mother was unable to supply K.S. with necessary shelter, we reverse the CHINS adjudication.[1]

We reverse.

## Issue

Whether there is sufficient evidence to support the CHINS adjudication.

## Facts

In June 2016, DCS received a report alleging that Mother had tested positive for marijuana after giving birth to K.S. Within twenty-four hours of K.S.'s

---

[1] Mother also argues that there is insufficient evidence that K.S. needs care, treatment, or rehabilitation that was unlikely to be provided without the coercive intervention of the court. Because we reverse the juvenile court on Mother's first issue, we need not address the second one.

birth, DCS Family Case Manager Kwanza Johnson ("FCM Johnson") went to Community North Hospital to speak with Mother. When FCM Johnson arrived at the hospital, Mother appeared to just be waking up. While Mother was still "pretty groggy," FCM Johnson explained "what [she] was there for and the nature of [her] report." (Tr. 17). Mother, who admitted that she had used marijuana two months earlier to increase her appetite during her pregnancy, became very "agitated and irate." (Tr. 20). Mother refused FCM Johnson's request that she submit to another drug screen. Mother told FCM Johnson that she had been living in a motel before being admitted to the hospital but that she planned to live with her cousin or mother following her discharge. Mother, however, refused to give FCM Johnson contact information for either her cousin or mother.

[4] After stepping out of Mother's hospital room and speaking with her supervisor by telephone, FCM Johnson "served [Mother] for court." (Tr. 22). FCM Johnson explained that, given Mother's behavior, DCS "had to restrict access to [K.S.]." (Tr. 22). The case manager further explained that restricted access meant that Mother "could not visit with the child or remove the child from the hospital." (Tr. 23). When FCM Johnson "served [M]other with the papers for Court," Mother "balled the paper up and threw it at [FCM Johnson] and told [FCM Johnson] to get the 'f' out of her room." (Tr. 26). A few days later, Mother contacted FCM Johnson and asked if the case manager could explain what was happening. FCM Johnson returned to the hospital and reviewed DCS paperwork with Mother. Mother signed the documents as requested.

FCM Johnson "explained what we were doing and why we were involved . . . ." (Tr. 27). Mother advised the case manager that after she was released from the hospital, she would be living at her cousin's house. Mother was calm and explained why she had initially been afraid of FCM Johnson. At this time, K.S. was "feeding well. . . . [T]here was nothing to note other than that." (Tr. 25). There was no evidence presented by DCS that K.S. tested positive for marijuana.

[5] DCS immediately filed a petition alleging that K.S. was a CHINS. Specifically, the petition alleged that Mother, who had admitted using marijuana while she was pregnant, had failed to provide K.S. with a safe, stable and appropriate living environment that was free from substance abuse. The petition further alleged that Mother was homeless and lacked a plan for obtaining and maintaining stable housing. DCS placed K.S. in foster care upon his discharge from the hospital.

[6] Testimony at the CHINS fact-finding hearing revealed that after it filed the petition alleging that K.S. was a CHINS, DCS had referred Mother to home-based case management services and supervised visitation. Home-based services case manager Gianna Simpson ("Case Manager Simpson") testified that she supervised two visits between Mother and K.S. in June 2016. During the visits, Mother "was very engaged with her son. . . . She did everything you expected a mother to do. She was loving, she [fed] him, changed his diaper . . . ." (Tr. 53). Mother told Case Manager Simpson that she was living with her cousin; however, visits took place at an agency because Mother told the case

manager that her cousin did not want visitation at her house. Mother specifically explained that "she kind of felt like she wasn't really wanted . . . or that the stress of everything and the contact with everyone was a little bit much for her cousin." (Tr. 48). Mother cancelled a scheduled visitation with K.S. in July 2016 and, at the time of the CHINS hearing in September and October 2016, Mother had had no further contact with her son.

[7] Further testimony at the fact-finding hearing revealed that DCS Case Manager Andrea Wilburn ("Case Manager Wilburn") was assigned to K.S.'s case in August 2016. When Case Manager Wilburn reached Mother after two weeks of attempting to contact her, Mother told her that everything was going well. Case Manager Wilburn further testified that Mother had open referrals for home-based case work, supervised visitation, random drug screens, and a drug assessment. The case manager recommended that Mother complete a parenting assessment because she had not seen K.S. since June 2016. Case Manager Wilburn also recommended that Mother complete a mental health assessment.

[8] K.S.'s foster mother testified that K.S. was "developing well, he's a happy little . . . baby meeting his milestones, doing well." (Tr. 65). Also at the hearing, Mother testified that she worked at a clothing store, was living with her cousin, and had "[her] own therapist," who was "outside of a DCS referral." (Tr. 40). Mother told the juvenile court the address of her cousin's house as well as the name of her therapist.

[9] Following the hearing, the trial court adjudicated K.S. to be a CHINS. Specifically, the juvenile court concluded, in relevant part, that:

> 15. [K.S.'s] physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision. [Mother] uses marijuana and does not have stable housing for herself and her child.

(App. 72-73). Mother appeals the adjudication.

## Decision

[10] Mother argues that there is insufficient evidence to support the CHINS adjudication. When determining whether there is sufficient evidence to support a CHINS determination, we consider only the evidence most favorable to the judgment and the reasonable inferences to be drawn therefrom. *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). This Court will not reweigh the evidence or reassess the credibility of the witnesses. *Id.* at 1286. Where, as here, a juvenile court's order contains specific findings of fact and conclusions of law, we engage in a two-tiered review. *In re A.G.*, 6 N.E.3d 952, 957 (Ind. Ct. App. 2014). First, we determine whether the evidence supports the findings, and then, we determine whether the findings support the judgment. *Id.* Findings are clearly erroneous when there are no facts or inferences to be drawn therefrom that support them. *Id.* A judgment is clearly erroneous if the findings do not support the juvenile court's conclusions or the conclusions do not support the resulting judgment. *Id.*

A mother's constitutionally protected right to raise her child is not without limitation. *E.P. v. Marion Cty. Office of Family and Children*, 653 N.E.2d 1026, 1031-32 (Ind. Ct. App. 1995). This is because the State has a compelling interest in protecting the welfare of the child by intervening in the parent-child relationship when parental neglect, abuse, or abandonment is at issue. *Id.* at 1032.

A CHINS proceeding is a civil action. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). Therefore, DCS must prove by a preponderance of the evidence that the child is a CHINS as defined by the juvenile code. *Id.* INDIANA CODE § 31-34-1-1 provides that a child is a CHINS if, before the child becomes eighteen (18) years of age:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with the necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; and
> >
> > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

A CHINS designation focuses on the child's condition rather than the parent's culpability. *In re N.E.*, 919 N.E.2d at 105. The purpose of a CHINS adjudication is to provide proper services for the benefit of the child, not to punish the parent. *Id.* at 106.

[14]    Here, Mother specifically contends that DCS failed to prove by a preponderance of the evidence that K.S.'s physical or mental condition was seriously impaired or seriously endangered as a result of Mother's inability, refusal, or neglect to supply K.S. with necessary food, clothing, shelter, medical care, education, or supervision. We agree.

[15]    As set forth in the relevant CHINS statute, it is DCS's burden to prove that a parent's actions or inactions have seriously endangered her child and that the child's specific needs have not been met. The trial court adjudicated K.S. to be a CHINS after concluding that Mother used marijuana and did not have stable housing. As to the first finding, Mother admitted that she had used marijuana two months before K.S.'s birth to increase her appetite during pregnancy. However, there is no evidence showing how, specifically, Mother's use of marijuana two months prior to giving birth *seriously* impaired or *seriously* endangered K.S. DCS presented no evidence that he tested positive for marijuana, or, even if he did, how a positive marijuana test would have or did endanger him. *See In the Matter of S.M.*, 45 N.E.3d 1252, 1255-56 (Ind. Ct. App. 2015) (concluding that there was no evidence presented that infant H.G. was endangered when he was born with marijuana-positive meconium). In fact, testimony at the hearing revealed that during his first days of life, K.S. was "feeding well" and that there was nothing other to note. (Tr. 25). During supervised visits with K.S. shortly after his birth, Mother was engaged and loving and "did everything you expected a mother to do." (Tr. 53). At the

time of the fact-finding hearing, K.S.'s foster mother testified that he was developing well and meeting his milestones.

[16] As to the second finding, DCS presented absolutely no evidence that Mother did not have stable housing. Rather, our review of the evidence reveals that within twenty-four hours of K.S.'s birth, Mother told FCM Johnson that she and her son planned to live with her cousin when they were discharged from the hospital. Mother's testimony at the fact-finding hearing confirmed that Mother had moved in with her cousin and had lived there for several months. Mother's statement to Case Manager Simpson that she felt that she "wasn't really wanted" at her cousin's house does not support the juvenile court's finding that Mother did not have stable housing. (Tr. 48). Although the trial court may have been concerned that at some point, Mother and K.S. would be asked to move out of Mother's cousin's house, at the time of the fact-finding hearing, this had not happened. *See S.M.* (explaining that future concerns rather than present facts are not enough to support a CHINS adjudication). Based upon the totality of this evidence, there is insufficient evidence to support the CHINS adjudication.

[17] Reversed.

May, J., and Brown, J., concur.