# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 16 2018, 9:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Heather M. Schuh-Ogle
Thomasson, Thomasson, Long & Guthrie, P.C.
Columbus, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of L.C.<br><br>C.J. (Mother),<br>*Appellant-Respondent,*<br><br>v.<br><br>Indiana Department of Child Services,<br>*Appellee-Petitioner.* | July 16, 2018<br><br>Court of Appeals Case No. 18A-JC-313<br><br>Appeal from the Bartholomew Circuit Court<br><br>The Honorable Kelly Benjamin, Judge<br><br>The Honorable Heather Mollo, Magistrate<br><br>Trial Court Cause No. 03C01-1706-JC-3442 |

**Bailey, Judge.**

# Case Summary

[1] Following fact-finding and dispositional hearings and orders, C.J. ("Mother") appeals[1] the trial court's order adjudicating her child, L.C. ("Child"), to be a Child in Need of Services ("CHINS"). The sole issue she raises on appeal is whether there was sufficient evidence to support the determination that Child is a CHINS. We hold that there was not; therefore, we reverse.

# Facts and Procedural History

[2] On June 22, 2017, Officer Jason Lancaster ("Officer Lancaster") with the Bartholomew County Sheriff's Office noticed Mother's vehicle parked at a rest park just south of Taylorsville. He had previously noticed the same vehicle parked at Heflin Park a few days earlier. When he approached the vehicle, Officer Lancaster noticed Mother and Child, then twelve years old, were sleeping in the front seat. It appeared to Officer Lancaster that Mother and Child were living in the vehicle. Mother informed Officer Lancaster that she and Child had been staying in their recreational vehicle ("RV") at Heflin Park, but that the RV was being repaired and they had been staying at the rest park the last couple of nights. Mother also informed Officer Lancaster that she was planning to travel to Florida with Child, and that she only had $20.00 in her

---

[1] J.C. ("Father") does not actively participate in this appeal.

pocket. Officer Lancaster contacted the Indiana Department of Child Services (DCS).

[3] DCS family case manager ("FCM") Edisa Mrkaljevic ("FCM Mrkaljevic") arrived to assess the family's situation. Mother explained to FCM Mrkaljevic that she and Child had been staying at Heflin Park in an RV but could only stay there for two weeks at a time and must be gone for a week prior to returning. Mother indicated that her RV was being repaired and she and Child had been staying at the rest park for the past three days.

[4] Mother disclosed to FCM Mrkaljevic that she had a history of methamphetamine use. FCM Mrkaljevic asked Mother to submit to a drug screen and Mother did so. Mother also informed FCM Mrkaljevic that Mother had been prescribed medications, including hydrocodone, and Mother provided her with the prescription medication bottles. One prescription bottle had a razor blade and a small section of a drinking straw inside of it. Mother told Officer Lancaster that the straw had not been used recently but that, when it was used, it was used for methamphetamine. Tr. at 37. Officer Lancaster then asked to look through the rest of Mother's purse and he discovered "some small white crystal product" inside a plastic baggie in a pill bottle. *Id*. at 37–38. Mother indicated that "she assumed" it was methamphetamine inside the baggie, but that she had found it in her camper and was intending to throw it away. *Id*. at 39.

[5] Mother was arrested on charges of Possession of Paraphernalia and Possession of Methamphetamine. DCS removed Child from Mother's care and placed her with Father, her non-custodial parent. However, DCS removed Child from Father's care five days later when it learned that Father tested positive for methamphetamine, amphetamine, and THC. DCS then placed Child with her maternal grandmother, Linda Coulter ("Coulter").

[6] On June 23, 2017, DCS filed a CHINS petition alleging, in relevant part:

> a. That [Child] is the biological child of [Mother] and [Father].
>
> b. That on June 22, 2017, the Indiana Department of Child Services received a report for an immediate assist in regards to [Child] with the perpetrator being [Mother] who was currently at Mile Marker 71 rest stop off of Interstate 65 Southbound.
>
> c. That upon arrival FCM Mrkaljevic was able to make contact with [Mother] and obtain a drug screen. [Mother] provided FCM with her current prescription of hydrocodone, which FCM noticed to have a straw and razorblade within the prescription bottle.
>
> d. That upon further investigation LEA[2] was able to search [Mother's] purse which contained another straw, blue in color, with white residue on the inside. LEA also found another prescription bottle that contained a small baggie with a crystal

---

[2] The document does not disclose for what "LEA" is an acronym.

like substance in it. Another bottle was also found that had an orange pill with a T on it.

e. Due to the items found on [Mother], LEA arrested her for possession of paraphernalia.

f. That prior to taking [Mother] to the local jail, FCM Mrkaljevic interviewed [Mother] who reported that she and [Child] have been living out of their RV, bouncing between Heflin Park and the rest stops off Interstate 65, but was planning on moving to Florida at the end of the month. That [Mother] denied any current substance use.

g. That FCM Mrkaljevic interviewed [Child] who confirmed her [sic] and her mother were living in their RV and planned to move to Florida. [Child] did not report any substance use concerns regarding her mother.

h. That due to concerns of mother's substance use, current arrest for possession of paraphernalia, and lack of stability[,] DCS found it to be in the best interests of the child to be removed from mother's care.

App. at 11-12.

[7] On August 22, 2017, the trial court held a fact-finding hearing at which Bridget Lorenz Lemberg ("Lemberg"), the Lab Director and Toxicologist at Forensic Fluids Laboratory, testified by telephone. Mother objected to the telephonic testimony, and the trial court permitted the testimony but noted that, later, it would issue specific findings as to the objection and the admissibility of the testimony. Lemberg testified that two drug screens of Mother "were positive,"

but she did not state when the drug screens were taken and for what substance they tested positive. Tr. at 17-18. DCS offered the results of the drug screens into evidence as Petitioner's Exhibits 1 and 2. Mother objected to the admission of those exhibits, and the trial court took the admissibility of those exhibits "under advisement until the completion of the evidence." *Id.* at 22.

[8]     FCM Mrkaljevic testified at the hearing regarding her interactions with Mother on June 22. She testified that she administered a drug screen to Mother after Mother admitted to a history of substance abuse, but that Mother "denied any recent [drug] use."[3] *Id.* at 44-45.

[9]     FCM Bethany Elmore ("FCM Elmore") also testified. She stated that, on June 28, Mother met with her and informed her that Mother had stayed a few nights with her brother. However, Mother would not tell FCM Elmore where she was currently staying and would not provide her brother's address. Mother met with FCM Elmore again for a "facilitation" on July 18. *Id.* at 61. FCM Elmore was aware that Child was placed with her maternal grandmother, Coulter, and that Mother visited Child at Coulter's home "about every other day." *Id.* at 57-58, 73. FCM Elmore testified that Mother's first drug screen "was positive," but she did not state for what substance it tested positive. *Id.* at 52. FCM Elmore testified that a second drug screen also tested positive "for substances" but did not specify what "substances." *Id.* at 53. She testified that DCS

---

[3] Contrary to the State's assertion, FCM Mrkaljevic did not provide any testimony regarding for what substance Mother tested positive. State's Br. at 18.

believed court intervention was necessary due to Mother's positive drug screens and "lack of stability." *Id*. at 59.

[10] Mother also testified at the fact-finding hearing. She stated that she and Child were staying in the RV at different locations and that she was always able to provide Child with three meals a day, "a roof over her head," and basic necessities. *Id*. at 64. Mother testified that she was able to support her family with her disability benefits and child support payments made by Father. She testified that she was prescribed medications for injuries she had sustained when she fell down some stairs. *Id*. at 65. She testified that, even when the location of their home changed, Child had attended and continued to attend the same school, i.e., Smith Elementary, from the time she was in first grade until the time she was removed from Mother. Mother testified that Child made the honor roll every year. She stated that she was currently living in the RV again at Heflin Park, where she had electricity, running water, and where Child had her own bed and room. Mother testified that she had plans to move the RV to a location where RVs were permitted to park on a monthly basis. And she testified that she had never been criminally charged as a result of her arrest on June 22.

[11] Coulter also testified at the hearing and confirmed that Mother had always provided for Child. She noted that Mother regularly visited Child and that the visits went well. She stated that Mother and Child have a very close relationship. Coulter testified that she believed Mother was a good mom who sometimes struggled financially but had gone without many times to ensure

that Child's needs were met. Coulter stated she had never observed Child without basic necessities. She testified that Mother and Child had been able to stay with her from time to time in the past. In addition, she was concerned about Child's grades since her removal from Mother because Child's most recent report reflected poor grades when previously she had consistently made the honor roll. Coulter believed the removal from Mother's care and the resulting general upheaval were contributing to Child's academic struggles.

[12] The trial court took the matter under advisement and, on December 5, 2017, it issued an Order on Fact Finding Hearing at which it issued the following relevant findings and conclusions:

> The Court being duly advised finds that [Child] . . .is a Child in Need of Services as alleged in the petition.
>
> The Court now adjudicates the child, [Child], a Child in Need of Services as defined by 31-34-1-1.
>
> In support for this conclusion of law, the following findings of fact are found:
>
> * * *
>
> 4) At the time of filing, [Child] and mother resided in Bartholomew County.
>
> 5) Detective Lancaster, with Bartholomew County Sheriff's Department, had contact with mother on or about June 22, 2017[,] while in the course of investigating another matter.

6) Detective Lancaster found mother and [Child] sleeping in a car at the southbound rest stop on I-65.

7) Mother admitted that she and her daughter had been staying at the rest area for approximately three days and were living out of the car.

8) Detective Lancaster contacted the DCS hotline with concerns as to the child's well-being.

9) CM Edisa Mrkaljevic, with local Bartholomew County DCS, was assigned to complete an assessment.

10) During the assessment, Mother further reported that she and the child typically live in a RV but not at a permanent location. For two weeks at a time, they stay at Heflin Park. However, park rules limit lengths of stays to two weeks and require customers to be gone for at least a week before allowing a return.

11) Mother stated the RV was being repaired, thus the reason the two were in a vehicle.

11a)[4] The only location mother identified as an alternate site to stay when not at Heflin Park was the rest stop where she and child were found.

12) The child appeared tired.

---

[4] The trial court erroneously listed two number 11s in its fact-finding section of the order. We refer to the second number 11 finding as number 11a.

13) The vehicle was observed to [be] full of "stuff." The child had difficulty finding her things in the car.

14) Mother also stated during the assessment that things were financially tough, that she only had $20.00 and that she was intending on traveling to Florida.

15) During the course of assessment, mother reported a history of methamphetamine use.

16) As part of assessment protocol, mother was asked to provide her prescription medication.

17) In one of the prescription bottles, a razor blade and a diagonally cut straw [were] found.

18) When asked if these items were used in association with a drug, mother responded in the affirmative for methamphetamine.

19) During the assessment, a small baggie filled with a white substance was found in mother's purse.

20) Another straw was found in mother's wallet.

21) Mother reported that she found the baggy in the RV, had intended to throw it away and that she presumed the substance to be methamphetamine.

22) Mother had no response as to why she was keeping a substance that she presumed to be methamphetamine in her purse.

23) Mother was arrested on June 22, 2017[,] for possession of methamphetamine and possession of paraphernalia.

24) DCS detained [Child] at the time due to mother's arrest, mother's instability, and mother's possible drug use.

25) [Child's] father was contacted during the assessment and/or arrest. Father reported that he knew mother was struggling and that she was staying back and forth between Heflin Park and the rest area. Father also reported that mother had a history of methamphetamine use but was unaware of her current use.

26) [Child] was originally placed with father until he provided a positive screen for methamphetamine and THC.

27) [Child] was then removed from her father's care and placed in relative care with maternal grandmother.

28) Father had a subsequent screen for methamphetamine and THC on June 27, 2017.

29) The DCS case was next assigned to FCM Bethany Elmore.

30) FCM Elmore met with mother at the DCS offices on June 28, 2017.

31) When asked about her living arrangements, mother would not say where she was staying.

32) FCM Elmore had no further contact with mother until her attendance at a Facilitation on July 18, 2017.

33) Mother and FCM Elmore agree that mother has not attempted to contact DCS since the facilitation on July 18, 2017.

34) FCM Elmore tried three times to speak to mother by calling the telephone number that mother provided. FCM Elmore could only leave messages for mother.

35) Maternal grandmother reports that the child's grades are poor; she is of the opinion that the upheaval with the living circumstances is affecting the child's grades.

36) At Fact-Finding, mother asserts that she was temporarily homeless for a short time while her RV was being repaired, but she has moved back in the RV.

37) Mother further asserts that the RV has beds for sleeping, electricity and running water.

38) Mother produced no evidence to support these assertions.

39) No pictures of the RV were introduced.

40) Mother offered no further information as to how she and her daughter have access to running water or electricity. No information was introduced as to whether Heflin Park offers actual campsites or whether there is hook-up available for water or electricity. In addition, no information was offered as to what type of restroom facilities, primitive or modern, are located at Heflin Park.

41) The parking lot of the I-65 rest stop most certainly does not provide hook[-]up for electricity or water, although sinks and restrooms would be available in the rest stop building.

42) Even assuming the RV meets minimum sufficient standards for shelter, the court cannot conclude that this is a single episode or one time occurrence.

43) At the very least, it is an unacceptable living arrangement for one week out of every three.

44) Mother had the opportunity to lend support to her assertions when asked about her living arrangements by FCM Elmore on June 28, 2017. Instead, mother refused to provide information about where she was staying.

45) The veracity of mother's assertions is also questionable given her conflicting statements of plans to travel in the car to Florida on $20.00.

46) The Court must consider both the evidence and the lack of evidence.

In adjudicating the child as a Child in Need of Services, the court finds the evidence set forth above to be sufficient *without considering two drug screens* completed by mother and offered into evidence by DCS. The court *withholds a ruling on the admissibility of the two drug screens*.

* * *

The Court finds that it is in the best interests of the child to be removed from the home environment and remaining in the home would be contrary to the welfare of the child because: of an inability, refusal or neglect to provide shelter, care, and/or supervision at the present time.

App. at 27-29 (emphasis added).

[13] The trial court held a dispositional hearing on December 19, 2017, at which FCM Jennifer Morgan ("FCM Morgan") testified regarding DCS's recommendations for services to Mother. She also referenced Mother's "positive drug screens" but did not state the timing of those drug screens or the substance(s) for which they tested positive. Tr. at 89. She testified that Mother had refused to submit to a drug screen after the fact-finding hearing on August 22. And she testified that she had only had contact with Mother twice since the fact-finding hearing, although she had tried to contact Mother by telephone on several occasions. However, FCM Morgan acknowledged that there was no court order in place requiring Mother to contact DCS or submit to drug screens.

[14] Mother also testified at the dispositional hearing. She stated that the white substance found in her RV had been turned over to law enforcement, but that she had never been charged with any crime.

[15] At the dispositional hearing, the trial court ordered Mother to engage in DCS-recommended services. The trial court "concede[d]" that the RV provided a roof and shelter, but stated it was troubled by the "transient nature of how [Mother] had to move around." *Id.* at 98. This appeal ensued.

# Discussion and Decision

## Standard of Review

[16] The trial court adjudicated Child to be a CHINS pursuant to Indiana Code Section 31-34-1-1, which provides:

A child is a child in need of services if before the child becomes eighteen (18) years of age:

(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

[17] In reviewing a CHINS determination, we do not reweigh evidence or assess witness credibility but consider only the evidence in favor of the juvenile court's judgment, along with any reasonable inferences arising therefrom. *J.M. v. Ind. Dep't of Child Servs. (In re N.C.)*, 72 N.E.3d 519, 523 (Ind. Ct. App. 2017). When the trial court enters findings of fact and conclusions of law, as the court did here, we apply a two-tiered standard of review to the issues covered by the findings: we consider, first, whether the evidence supports the findings and, second, whether the findings support the judgment. *J.B. v. Ind. Dep't of Child Servs. (In re S.D.)*, 2 N.E.3d 1283, 1287 (Ind. 2014); Ind. Trial Rule 52(A).

[18] However, "we review the remaining issues under the general judgment standard, under which a judgment will be affirmed if it can be sustained on any legal theory supported by the evidence." *In re S.D.*, 2 N.E.3d at 1287.

(quotation marks and citation omitted). Under the general judgment standard of review, the reviewing court "may look both to other findings and beyond the findings to the evidence of record to determine if the result is against the facts and circumstances before the court." *C.B. v. B.W.*, 985 N.E.2d 340, 344 (Ind. Ct. App. 2013), *trans. denied*. In deference to the trial court's proximity to the issues, an appellate court will "disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment." *In re Guardianship of B.H.*, 770 N.E.2d 283, 287-288 (Ind. 2002) (quotations and citations omitted).

## Sufficiency of Evidence that Child is a CHINS

[19] A CHINS adjudication under Indiana Code Section 31–34–1–1 requires three basic elements: "that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d at 1287. That final element "guards against unwarranted State interference in family life, reserving that intrusion for families where parents lack the ability to provide for their children, not merely where they encounter difficulty in meeting a child's needs." *Id*. (quotation marks and citation omitted).

[20] Courts should consider the family's condition not only at the time the CHINS case was filed, but also when the case is heard at the fact-finding hearing. *Gr.J. v. Ind. Dep't of Child Serv.* (*In re D.J.*), 68 N.E.3d 574, 580 (Ind. 2017); *see also*,

*E.B. v. Ind. Dep't of Child Serv.* (*In re Des.B.*), 2 N.E.3d 828, 836 (Ind. Ct. App. 2014) (quotation marks and citation omitted) ("A CHINS adjudication may not be based solely on conditions that no longer exist, but the court should consider the family's situation at the time the case is heard by the court."). DCS has the burden of proving by a preponderance of the evidence that the children are CHINS. *See, e.g.*, *J.J. v. Ind. Dep't of Child Serv.* (*In re K.S.*), 78 N.E.3d 740, 744 (Ind. Ct. App. 2017). DCS may not simply rely upon allegations; rather, it must gather the facts and the evidence to support its CHINS petition. *D.B. v. Ind. Dep't of Child Serv.* (*In re D.B.*), 43 N.E.3d 599, 606 (Ind. Ct. App. 2015), *trans. denied.*

[21] A CHINS designation "focuses on the child's condition rather than the parent's culpability." *In re K.S.* at 745 (citing *N.L. v. Ind. Dep't of Child Serv.* (*In re N.E.*), 919 N.E.2d 102, 105 (Ind. 2010)). "The purpose of a CHINS adjudication is to provide proper services for the benefit of the child, not to punish the parent." *Id*.

> To be a CHINS, a child must be seriously impaired or endangered "as a result of the inability, refusal, or neglect of the child's parent" to provide necessary care. Ind. Code § 31–34–1–1 (emphasis added). Children cannot become CHINS by the mere happenstance of a family's economic misfortune; the statute requires an action or failure to act by the parent that leads to serious endangerment of the children as a result of the lack of necessary care. [*A.M. v. Ind. Dep't of Child Serv.*,] *In re S.M.*, 45 N.E.3d [1252,] 1256 [(Ind. Ct. App. 2015)] ("The mere fact of an unemployed parent does not make a CHINS. The mere fact of a family on food stamps does not make a CHINS. Even the mere

> fact of a family living in a shelter while seeking stable housing
> does not make a CHINS.").

*Ja.K. v. Ind. Dep't of Child Serv.* (*In re S.K.*), 57 N.E.3d 878, 883 (Ind. Ct. App.
2016).

[22]   Here, the trial court based its CHINS determination on its finding that Mother
had unstable housing.[5]  The trial court found[6] that "at the very least, [Mother
had] an unacceptable living arrangement for one week out of every three."
App. at 29.  However, the evidence does not support that finding.  DCS
provided evidence that Mother and Child were living in Mother's car at the
time Child was removed, but it did not provide any evidence that Mother's
housing was inadequate at the time of the fact-finding hearing.  The only
evidence regarding Mother's living arrangements at the time of the hearing was
Mother's testimony that she had repaired her RV and was again living in it at

---

[5]   The court correctly did not base its CHINS determination on Mother's arrest.  *See Perrine v. Marion Cty. Office of Child Servs.*, 866 N.E.2d 269, 277 (Ind. Ct. App. 2007) (holding Mother's arrest was insufficient to uphold a CHINS where law enforcement had prevented her from arranging for temporary care of the child and criminal charges were dropped).  The trial court also correctly did not base its adjudication on alleged recent drug abuse.  There was no evidence of what the white substance found in Mother's RV was, and the mere presence of drug paraphernalia in a residence is insufficient to support a finding of neglect.  *Id.*  The only evidence in the record regarding recent drug use was that Mother tested positive for drugs or "substances."  Tr. at 53.  However, the results of those drug screens were not in evidence, nor was there any testimony regarding for what drug Mother tested positive.  As there was evidence that Mother was taking prescription drugs, it is not possible to determine from the record whether the drug screens were positive for legal or illegal drugs.  Thus, the trial court made no finding that Mother had recently used illegal drugs or that she had ever used illegal drugs in Child's presence.  And evidence of a history of substance abuse, alone, is insufficient to uphold a CHINS adjudication.  *In re S.M.*, 45 N.E.3d at 1256.

[6]   The State is mistaken when it contends that Mother does not challenge any of the court's findings of fact. Mother asserts there is no evidence to support the finding that she failed to provide adequate shelter for Child.

Heflin Park, where she had electricity and running water. DCS provided no evidence that Mother's RV was insufficient housing or that it had ever requested to inspect Mother's RV.

[23] There was evidence that Mother could park her RV at Heflin Park for only two weeks at a time, and that she parked the RV at rest stops every third week. However, there was no evidence that living in the RV at a rest stop every third week had in any way endangered Child or caused her needs to be unmet. Mother testified that she had income from disability benefits and child support payments from Father. She further testified that Child had her own bed and room in the RV and that Child at all times had food and shelter, with running water and electricity. DCS presented no evidence to the contrary.

[24] Mother further testified that Child had gone to the same school from first grade onward, even when she lived with Mother in the RV. And Mother testified that Child was on honor roll each school year. Again, DCS presented no evidence to the contrary. Coulter also testified that Child had a very close relationship with Mother and that her grades had been suffering ever since she had been removed from Mother's care.

[25] The only evidence in the record of inadequate housing was testimony regarding the three-day period when Mother and Child temporarily lived in Mother's vehicle while the RV was being repaired. However, there was no evidence that the temporary living situation seriously endangered Child. Moreover, that situation had been remedied by the time of the fact-finding hearing and there

was no evidence that such a situation was likely to occur again. *See In re Des.B.*, 2 N.E.3d at 836 (noting a CHINS adjudication may not be based solely on conditions that no longer exist). DCS failed to prove[7] by a preponderance of the evidence that Mother's actions or inactions seriously endangered Child, that Child's needs were ever unmet, or that Child's needs would not be met in the future without the coercive intervention of the state.

Reversed.

Crone, J., and Brown, J., concur.

---

[7] To the extent the trial court put the burden of proof on Mother to prove that she had adequate housing, rather than on the State to prove Mother had inadequate housing—*see* findings 38-40, App. at 29—the trial court erred as a matter of law. *In re K.S.*, 78 N.E.3d at 744; *In re D.B.*, 43 N.E.3d at 606.