## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 15 2018, 10:21 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Daniel G. Foote
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Matter of K.J. and J.J., Minor Children, and J.J., Mother,<br><br>*Appellant-Respondent*,<br><br>v.<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner*. | November 15, 2018<br><br>Court of Appeals Case No. 18A-JC-699<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Marilyn A. Moores, Judge<br><br>The Honorable Heather Welch, Special Judge<br><br>Trial Court Cause Nos. 49D09-1707-JC-2391 49D09-1707-JC-2392 |

**Brown, Judge.**

[1] J.J. ("Mother") appeals the trial court's order determining that K.J. and J.J. (the "Children") are children in need of services ("CHINS"). Mother raises two issues which we consolidate and restate as whether the evidence is sufficient to support the court's determination that the Children are CHINS. We affirm.

*Facts and Procedural History*

[2] On June 12, 2016, Mother gave birth to K.J. On June 29, 2017, this Court issued an opinion reversing the CHINS adjudication of K.J. *See In re Matter of K.S.*, 78 N.E.3d 740, 742 (Ind. Ct. App. 2017).[1] We stated:

> Mother specifically contends that DCS failed to prove by a preponderance of the evidence that [K.J.'s] physical or mental condition was seriously impaired or seriously endangered as a result of Mother's inability, refusal, or neglect to supply [K.J.] with necessary food, clothing, shelter, medical care, education, or supervision. We agree.
>
> As set forth in the relevant CHINS statute, it is DCS's burden to prove that a parent's actions or inactions have seriously endangered her child and that the child's specific needs have not been met. The trial court adjudicated [K.J.] to be a CHINS after concluding that Mother used marijuana and did not have stable housing. As to the first finding, Mother admitted that she had used marijuana two months before [K.J.'s] birth to increase her appetite during pregnancy. However, there is no evidence showing how, specifically, Mother's use of marijuana two months prior to giving birth *seriously* impaired or *seriously* endangered [K.J.]. DCS presented no evidence that he tested positive for marijuana, or, even if he did, how a positive

---

[1] In *In re Matter of K.S.*, K.J. was referred to as K.S. On August 16, 2017, this Court's opinion in *In re Matter of K.S.*, 78 N.E.3d 740, was certified.

marijuana test would have or did endanger him. *See In the Matter of S.M.*, 45 N.E.3d 1252, 1255-56 (Ind. Ct. App. 2015) (concluding that there was no evidence presented that infant H.G. was endangered when he was born with marijuana-positive meconium). In fact, testimony at the hearing revealed that during his first days of life, [K.J.] was "feeding well" and that there was nothing other to note. (Tr. 25). During supervised visits with [K.J.] shortly after his birth, Mother was engaged and loving and "did everything you expected a mother to do." (Tr. 53). At the time of the fact-finding hearing, [K.J.'s] foster mother testified that he was developing well and meeting his milestones.

As to the second finding, DCS presented absolutely no evidence that Mother did not have stable housing. Rather, our review of the evidence reveals that within twenty-four hours of [K.J.'s] birth, Mother told FCM Johnson that she and her son planned to live with her cousin when they were discharged from the hospital. Mother's testimony at the fact-finding hearing confirmed that Mother had moved in with her cousin and had lived there for several months. Mother's statement to Case Manager Simpson that she felt that she "wasn't really wanted" at her cousin's house does not support the juvenile court's finding that Mother did not have stable housing. (Tr. 48). Although the trial court may have been concerned that at some point, Mother and [K.J.] would be asked to move out of Mother's cousin's house, at the time of the fact-finding hearing, this had not happened. *See S.M.* (explaining that future concerns rather than present facts are not enough to support a CHINS adjudication). Based upon the totality of this evidence, there is insufficient evidence to support the CHINS adjudication.

*Id.* at 745.

[3]     On July 13, 2017, Mother gave birth to J.J. On July 24, 2017, the Indiana Department of Child Services ("DCS") filed a petition alleging that the

Children were CHINS based in part upon Mother's failure to provide them with a safe and appropriate living environment free from substance abuse. That same day, the court held an initial hearing and ordered the continued removal of K.J. from Mother's care, and placement of J.J. with Mother in home contingent upon her participation in a substance abuse assessment, home based case management, home based therapy, and random screens and following all recommendations. The court ordered that Mother have no less than six hours per week of supervised parenting time with K.J.

[4] On September 6, 2017, the trial court held a pretrial conference, scheduled an adjudication hearing for November 6, 2017, and ordered Mother to submit to a drug screen within forty-eight hours. On September 8, 2017, Mother filed a Motion to Dismiss or, in the Alternative, Motion for Immediate Temporary Trial In-Home Visitation or Relative Care. She argued that the case should be dismissed based upon this Court's previous opinion reversing the CHINS adjudication of K.J., *res judicata*, and the allegations in DCS's petition. In the alternative, she requested that the court order immediate temporary trial in-home visitation with K.J. That same day, the court entered an order indicating that it would take the motion under advisement until the September 19, 2017 hearing. On September 15, 2017, DCS filed a request for removal of J.J. from in-home placement with Mother, objected to Mother's request for dismissal, and objected to immediate placement of K.J. in home with Mother.

[5] On September 19, 2017, the court held a hearing and entered an Order of Detention with respect to J.J. finding that it was in the best interests of the child

to be removed from the home environment, and that remaining in the home would be contrary to the child's welfare because of: an inability, refusal or neglect to provide shelter, care, and/or supervision; the child needing protection that cannot be provided in the home; Mother's continued use of marijuana prior to and following this child's birth; Mother's instability of housing; Mother's lack of knowledge as to where [J.J.] is physically at this time; Mother's failure to participate in court ordered services designed to assure the child's safety; and Mother's lack of communication with DCS, the guardian ad litem, and service providers. The court ordered Mother to relinquish J.J. to DCS custody and also denied her motion to dismiss. It ordered her to participate in random drug screens, a substance abuse assessment, home based case management, home based therapy, and supervised parenting time.

[6] On November 6, the court held a hearing. Family Case Manager Dermita Johnson ("FCM Johnson") testified that she came into contact with Mother on July 14, 2017, at Community Hospital when J.J. was one or two days old. FCM Johnson later went to Mother's home where Mother informed her that she knowingly, while pregnant, smoked marijuana every other day. She testified that she attended a child and family team meeting on July 31, 2017, which was a date confirmed by Mother, but Mother did not attend.

[7] Carol Cliff, a visit supervisor and parent aid, testified that she received a referral in July for supervised visits between K.J. and Mother. She testified that it was initially "a little hard" to contact Mother, but eventually developed a schedule with Mother's participation. Transcript Volume II at 54. She testified that the

schedule did not work out well because Mother had a difficult time with transportation and that the only visit Mother had was when she provided transportation for her. For the following visit, Mother had stated that she had transportation to the visit, but she did not show up. For the next scheduled visit, Mother texted Cliff about a half hour before the visit to cancel it due to "her being exhausted from being up with the new baby." *Id.* at 56. Cliff subsequently attempted to make contact with Mother by calling and texting but was unable to do so to proceed with other visits.

[8]     Bethany Crismore, a therapist, testified that she received a referral on August 15, 2017, and was assigned to perform an intake with Mother to begin services. Crismore made eight phone calls and went to Mother's apartment to attempt to meet her face to face, but Mother did not answer the door. Crismore testified that she connected with Mother on four phone calls, but Mother twice told her she was busy and asked if she could call her back, one time said she had a kidney infection and that she would call her back, and another time Mother did not "actually say anything" to her. *Id.* at 65. Crismore stated that Mother did not call her back, Mother did not complete an intake, and the referral was sent back on August 30, 2017.

[9]     Latrice Smith ("Smith"), a home based case manager, testified that she received a referral for Mother at the end of September for case management and supervised visits. She testified that she spoke with Mother in "maybe mid-September to schedule a visit," but "[t]hat did not happen." *Id.* at 69. She stated that she supervised eight visits between Mother and K.J. and J.J.

beginning on September 19th. When asked about the visits, Smith testified that they never had any major incidents, there was "some lack in parenting" in being able to manage both children at the same time, and that K.J. walked off a couple of times in the parking lot because Mother struggled with the "logistics of getting both kids to the car." *Id.* at 70-71. She also testified that K.J. wandered off in the visit area, and that she had to ask Mother to go get K.J. "maybe at least four times." *Id.* at 72.

[10] Smith also testified that she provided transportation to Mother and picked her up "from a couple of motels and from a house – apartment." *Id.* at 74. Mother told her that she was having issues paying for the motel and asked to borrow some money. She testified that she made a plan to meet Mother two times per week regarding employment, housing, and parenting skills, but she met with her only once in six weeks because Mother cancelled a number of meetings due to job interviews "or something like that." *Id.* at 78. Smith testified that there were some "no call, no shows" with respect to visits with the Children and that one visit ended early so that Mother could make sure she entered the home where she was staying. *Id.* at 78. On cross-examination by the guardian ad litem's counsel, Smith stated that she reduced the available visits from six hours to three hours because Mother was having issues making it both days for six hours.

[11] Brittany Smith ("Brittany"), a home based case management service provider, testified that she received a referral for Mother on October 13, 2017, contacted Mother, and scheduled an intake for October 18th. She stated that she

informed Mother that she could meet her at Mother's home, Mother told her that was not possible, and they scheduled to meet at a local library. Brittany went to the library and called Mother and Mother stated that she "wasn't going to be able to get there right away because her ride had something wrong with her car and had to get it fixed." *Id.* at 108. They rescheduled for October 23rd, but Mother sent Brittany a text message that morning saying that she could not obtain a ride. Brittany offered to meet Mother where she was, but Mother said "that wasn't possible." *Id.* They rescheduled for the next day, but Mother again said she "didn't have a ride to be able to meet," Brittany told her that she could meet Mother where she was, and Mother said she was at her cousin's home and her cousin did not have furniture yet. Brittany told her that was fine, but Mother declined to meet with her. Brittany scheduled a meeting for October 27th and told Mother she would have to close out the referral if Mother cancelled, Mother expressed understanding, and Brittany was unable to reach Mother on the day of the appointment.

[12] Taylor Yeskie, a home based caseworker and visitation facilitator, testified that she was assigned to Mother in March 2017 and provided transportation for prenatal doctor appointments and trips to the pharmacy, work, and court. She testified that Mother told her that she would screen positive for marijuana and that she used marijuana in order to have an appetite. Yeskie stated that when Mother picked out chips and a drink at a gas station, Yeskie told her that she could get peanut butter and bread that would last her longer than just that evening because Mother was complaining that she was not making enough

money to eat. Mother twice "no showed on" Yeskie, and Yeskie subsequently "basically just did the transportation to and from wherever [Mother] needed." *Id.* at 119.

[13] Randi Turner, a home based caseworker, testified that he was Mother's caseworker from June until August 2017, and that he saw Mother once a week in the beginning but "it just kind of died off." *Id.* at 128. He stated that he made efforts to contact Mother but would receive no response and closed the referral.

[14] On November 9, 2017, the court continued with the hearing. Cindy Strietelmeier, an employee of Families First who processed referrals from DCS and initiated the first appointments for all clients, testified that she received a referral from DCS for Mother for a substance abuse assessment and contacted her on June 29, 2017. Strietelmeier informed Mother that assessments can occur anytime between 10:00 a.m. and 3:00 p.m. on Mondays and Thursdays. Mother agreed that she would do a walk in on one of those days but never showed up.

[15] Guardian ad litem Greg Huff ("GAL Huff") testified that he was assigned to the Children on July 24, 2017. He stated that he met with Mother on August 2, 2017, at the Beech Hollow address,[2] that Mother admitted she tested positive for marijuana at the initial hearing, that she stated she was "possibly interested

---

[2] At some points in the transcript, Beech Hollow is spelled Beech Hallow.

in leaving [K.J.] where he was in the foster home because she hadn't seen him in so long . . . as long as she could keep [J.J.] with her," and that she was in her apartment "for a while but she wasn't going to be there indefinitely." Transcript Volume III at 17. GAL Huff testified that he was somewhat concerned with J.J. remaining in the home and that he attempted to contact Mother to see J.J. but was unsuccessful in reaching her at Beech Hollow or elsewhere. He stated his agreement that Mother complete services related to her stability and substance abuse "[b]ecause it's necessary for the children" and "[t]hey need the stability of a home and a mother that is going to be able to be there that does not have a history of homelessness and concerns regarding substance abuse." *Id.* at 28. When asked why it was important that Mother verify her sobriety, he answered: "Because if she's – if she can do that, that's a positive. But in this situation, I don't see that that's happening at this time because of the usage of the marijuana that she had been doing quite a bit of." *Id.* at 34-35. He testified that he did not believe the Children would be safe with Mother due to her homelessness and marijuana usage. He also testified that Mother's inconsistent pattern of visitation with the Children was a concern.

[16] Mother testified that she was living at the same Beech Hollow address and that she gave an address on Byrum Avenue in K.J.'s case because that was where she was staying when K.J. came home from the hospital. She testified that her case manager picked her up at different hotels because her friend was staying there. She testified that she used marijuana when she was pregnant with K.J. and J.J., and that she used marijuana a couple of months after J.J. was born to

calm her nerves. When asked if J.J. was with someone else for a day or part of a day, she answered: "She didn't never go with nobody." *Id.* at 63. When asked "[e]xcept for the day you came to court," Mother answered affirmatively. *Id.* When asked "[a]nd she was with her father," Mother answered: "Yeah, but the only reason I did that was because I had to take the bus." *Id.* at 64. She testified that she would not leave her child in the care of someone who uses marijuana because she "wouldn't leave my child with nobody." *Id.* The following exchange then occurred:

> Q. Okay, but why wouldn't you want – would you want somebody who's high on marijuana taking care of your kids?
>
> A. What do you mean? I don't be around nobody that smokes. My roommate don't smoke.
>
> Q. My question is, would you – if you knew the caregiver, if you knew who you were going to have babysitting your child, if you knew they were using marijuana, would you allow them to watch your child?
>
> A. Yeah, there's nothing wrong with marijuana. They prescribe it in California. It's free, like there's nothing wrong with marijuana. You're not going to hurt a child off of smoking marijuana. I'm sorry. I could see if it was heroin or all them other drugs, then no – hell no. I'm not stupid.

*Id.*

[17]  Mother testified that she did not have a job, that she receives food stamps and TANF, she does not pay rent, and that she pays for only "lights." *Id.* at 76. When asked why she frequently missed visits with the Children, she stated:

"Well, a couple of times I had interviews. A couple of times it was because of the caseworker – because of the caseworker but (indiscernible)." *Id.* at 77. When discussing marijuana, the guardian ad litem's attorney asked mother, "And [J.J.] was in your care when you used?" *Id.* at 80. Mother answered: "Yes." *Id.* She testified that she obtains her marijuana "from people," that she does not buy marijuana, and that people who are not her friends give it to her. *Id.* She stated that when she goes out to obtain the marijuana she leaves J.J. with her roommate. She testified that J.J.'s father was Isaiah but she did not remember his last name and that she did not know K.J.'s father. She stated that she was in a relationship with a person who she considers her boyfriend but she did not know his name, where he lived, whether he had a job, or the names of his children. Mother denied having sex in exchange for money, marijuana, or housing.

[18] On November 16, 2017, the court continued with the hearing. Angela Snyder, a registered nurse, testified that she discussed Mother's substance abuse history with her and that Mother said she had smoked marijuana but not in a long time. She testified that Mother did not want to talk to the case worker at the hospital or anyone in DCS and was "very upset." Transcript Volume IV at 37.

[19] Smith, the home based case manager, testified that a visitation was scheduled at noon on November 10th, she picked up the children and arrived at the office, but Mother did not show. She testified that she texted Mother but did not receive a timely response.

[20] Family Case Manager Nokwakhe Fuyana ("FCM Fuyana") testified that she was assigned to work with K.J. in December 2016. Between then and March 2017, FCM Fuyana attempted to communicate with Mother but Mother would not respond to any of her emails. After FCM Fuyana eventually received Mother's phone number, Mother said that she had no reason to speak with DCS and later stated that she was busy and could not talk to her on the phone. Mother also did not respond to text messages. FCM Fuyana testified that she discussed drug screens with Mother in March 2017 and that Mother refused to take a drug screen. She testified that she attended the June 8, 2017 hearing, that she had a discussion with Mother on that date about services and asked Mother to screen before and after the hearing, and Mother refused. She also testified that Mother refused to screen after the July 25th hearing. She stated that Mother participated in choosing a date for a team meeting, the meeting was scheduled for July 31st, she called Mother prior to the meeting but Mother would not answer her phone, she texted Mother, and Mother told her that she was babysitting and trying to make some income and she would not make it to the meeting. Mother also failed to attend a subsequent team meeting and did not respond to FCM Fuyana's calls or text messages. She testified that Mother refused to perform a screen after the November 9th hearing. FCM Fuyana recommended continued placement of K.J. and J.J. with the current foster parents and that services continue for Mother including home based therapy, home based casework, substance use assessment, and supervised visitation.

FCM Fuyana testified that she had a BSA in psychology and sociology, a BSA Honors in social development, and went through Core Training from June 2015 until October 2015. She testified that drug use by a parent is a safety concern and "[t]here is more concern if the child is very young because the child cannot make decisions – safety decisions on their own." *Id.* at 88. She also testified that she was recommending home based case management because it assists clients with maintaining stability in housing. When asked what caused her to request that J.J. be removed from Mother in September, she stated:

> At that time I had made numerous attempts – um – to see [J.J.] at the home. And one of my duties as a family case manager is to have face to face contact with the child in the home – uh – to determine if the child is safe in the home. Is the child in a secure environment. If the child is [in] a stable environment. If the environment has all the needed utilities. And with [J.J.] I was not able to do that. Um – with [J.J.] I was not able to also establish if the child was in a drug free environment.

*Id.* at 94. She indicated that she was concerned for J.J.'s safety at the time she recommended her removal from Mother's care. When asked why, she answered:

> Because . . . we had established – um – [Mother's] substance abuse – continued substance use. And we have not found a home where [Mother] was currently living with the child. And I made repeated attempts – um – to get to see the child in the home or let alone just to see the child. Um – even at the date of removal I was not able to see the child at the day of removal. It had to be another DCS worker because [Mother] would not avail the child. So, it's a cause of safety concern for DCS not to be able to have access to the child as in – as in when needed.

*Id.* at 97.

[22]     On February 8, 2018, the court entered a nineteen-page order adjudicating the Children as CHINS. The court found that Mother had used marijuana, had unstable housing, was not able to meet her own basic needs or those of the Children, and lacked the parenting skills necessary to keep the Children safe. The court also found that Mother's inconsistency with visits was harmful to her relationship with the Children, that Mother would not participate in services without the coercive intervention of the court, that Mother failed to comply with court orders, that her continued drug use was detrimental to the health and well-being of her children, and that Mother's lack of employment causes concern about her ability to provide food, clothing, and shelter for the Children. The court concluded that the Children were both CHINS "because they are victims of neglect as pursuant to I.C. § 31-34-1-1 as evidence[d] by Mother's unstable housing, ongoing substance abuse during pregnancy and after, and failure to engage in the services designed to allow the children to remain in her care." Appellant's Appendix Volume II at 202. The court also stated: "It was clear from Mother's demeanor during the three-day hearing that she did not take this hearing seriously and did not take parenting small children seriously. She would roll her eyes at the testimony of witnesses she did not like, make other inappropriate faces, and have outbursts during the trial." *Id.* at 203-204.

[23] On March 1, 2018, the court held a dispositional hearing at which Mother was not present and her substitute counsel did not know where she was.[3] FCM Fuyana testified that she requested random drug screens and a substance abuse assessment because Mother had admitted to drug use before, during, and after pregnancies of K.J. and J.J. She testified that Mother had shown instability in terms of housing, that "nobody has actually made any contact with her in the said address that she gave us," that Mother has "been known to move from hotel to hotel," that she has shown "instability for transportation issues," has issues with her financial situation, and has shown that she is not able to manage herself. Transcript Volume V at 15. She also testified that Mother had not voluntarily participated in any services. She indicated that Mother had not made any progress in alleviating her concerns with Mother's housing since the November 16, 2017 hearing. On cross-examination by Mother's counsel, she testified that Mother told her where she was living and that she went to the address only to find a person who kept insisting that Mother does not reside there. On redirect, FCM Fuyana testified that Mother has missed and has refused to take drug screens.

[24] Mother's counsel requested that the court bifurcate the hearing so that Mother could be present. Counsel for the guardian ad litem and DCS objected. The court called Mother's cell phone and then FCM Fuyana called Mother's cell

---

[3] Rachel Johnson stated at the beginning of the hearing that she was filling in for Mother's counsel that morning.

phone, but there was no answer. The court clarified that FCM Fuyana reminded Mother of the date of the hearing, and Mother's substitute counsel indicated that she knew Mother's counsel and Mother had been in contact about the hearing. The court stated in part:

> [Mother] just has this history of – um – not appearing and then kind of like today, I anticipated she wasn't gonna answer. Cause they then do the same thing, right, Ms. – and you then call her and try to say hey, we – we wanna give you a ride. We wanna make this happen, we wanna help you. And so – uh – she's just elected not to participate.

*Id.* at 42-43.

[25] The court also stated: "I watched [Mother] very closely because she – she had several outbursts when other people were on the witness stand. Um – when she was on [the] witness stand her demeanor I found to be – uh . . . I didn't believe everything she was telling the Court and so I had concerns." *Id.* at 53. The court also stated:

> [Mother] admitted that when she was staying for a short time at the Beech [Hollow] address that the lady – uh – who she was staying with – she let the lady hold her baby. She went out and she – uh – smoked marijuana and she came back and cared for the baby. And this is within – um – August or September. The baby was born in July. The baby was little. Um – and she quite frankly and I think she – she was very honest with the Court. She didn't see why that's a problem. She thought it was okay to use controlled substances or alcohol and then care for a baby. She didn't think it was an issue. She can't understand why the Court would find that to be an issue.

*Id.* at 55.

[26] On March 7, 2018, the court entered a dispositional order, incorporated its February 2018 order, found that Mother does not have stable housing or employment, uses marijuana on a regular basis and has done so while pregnant with both children and while caring for J.J., demonstrated erratic and unusual behavior, refused to take drug screens, and elected to not appear in court, cooperate with DCS, or exercise regular parenting time.

### *Discussion*

[27] The issue is whether sufficient evidence supports the trial court's determination of the Children's status as CHINS. In reviewing a trial court's determination that a child is in need of services, we neither reweigh the evidence nor judge the credibility of witnesses. *In re S.D.*, 2 N.E.3d 1283, 1286-1287 (Ind. 2014), *reh'g denied.* Instead, we consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. *Id.* at 1287. As to issues covered by findings, we apply the two-tiered standard of whether the evidence supports the findings and whether the findings support the judgment. *Id.* We review remaining issues under the general judgment standard, under which a judgment will be affirmed if it can be sustained on any legal theory supported by the evidence. *Id.* "We will reverse a CHINS determination only if it was clearly erroneous." *In re D.J. v. Indiana Dep't of Child Servs.*, 68 N.E.3d 574, 578 (Ind. 2017). A decision is clearly erroneous if the record facts do not support the findings or if it applies the wrong legal standard to properly found facts. *Id.*

[28]    Ind. Code § 31-34-1-1 provides:

> A child is a child in need of services if before the child becomes
> eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired
> or seriously endangered as a result of the inability, refusal, or
> neglect of the child's parent, guardian, or custodian to supply the
> child with necessary food, clothing, shelter, medical care,
> education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
>> (A) the child is not receiving; and
>>
>> (B) is unlikely to be provided or accepted without the
>> coercive intervention of the court.

[29]    The CHINS statute, however, does not require that a court wait until a tragedy occurs to intervene. *In re A.H.*, 913 N.E.2d 303, 306 (Ind. Ct. App. 2009). Rather, a child is a CHINS when he or she is endangered by parental action or inaction. *Id.* The purpose of a CHINS adjudication is not to punish the parents, but to protect the child. *Id.*

[30]    Mother argues that the trial court's findings regarding her use of marijuana are insufficient to support the CHINS determination. She argues that she testified that she never used marijuana around the Children and points out that possession of small amounts of marijuana is only a class B misdemeanor in Indiana, and other states have laws legalizing marijuana in some form. Mother asserts that the court's findings regarding her housing are insufficient to support the CHINS determination because she testified she had never been homeless.

She argues that the court's findings regarding her employment, financial situation, supervision, parenting skills, demeanor, and compliance with services are not supported by the evidence and are insufficient to support the CHINS determination.

[31] With respect to Mother's marijuana use, the record reveals that FCM Johnson testified that Mother informed her that she smoked marijuana every other day and that caseworker Yeskie testified that Mother told her that she would screen positive for marijuana. GAL Huff testified that Mother admitted she tested positive for marijuana. GAL Huff also indicated that it was important that a parent ensure sobriety before he recommends placement of the child back into the home and that this is especially true when a baby is involved. He testified that he did not believe the Children would be safe with Mother at this point "[b]ecause I think that the situation of the fact that [what I] call homelessness and the fact of the intense use of marijuana . . . ." Transcript Volume III at 36. FCM Fuyana testified that drug use by a parent is a safety concern, especially for a baby. Mother testified that she used marijuana, and the guardian ad litem's counsel asked Mother, "And [J.J.] was in your care when you used?" *Id*. at 80. Mother answered: "Yes." *Id.* She also testified that she goes out and meets people to obtain marijuana and leaves J.J. with her roommate.

[32] To the extent Mother challenges the court's findings and conclusion regarding her housing instability, the record reveals that Indianapolis Metropolitan Police Officer Ivan Ivanov testified that he was dispatched to Motel Super 8 on May 27, 2016, and came into contact with Mother who was staying there and was a

victim of a robbery. Case manager Smith testified that she provided transportation to Mother and picked her up "from a couple of motels and from a house – apartment." Transcript Volume II at 74. Brittany, a home based case management service provider, testified that Mother told her that meeting at Mother's home was not possible, Mother said she did not have transportation, and Mother could not meet her at her cousin's home where she was because her cousin did not have furniture yet and thereafter declined to meet with Brittany. GAL Huff testified that he became concerned that Mother was no longer living at the Beech Hollow address with J.J., attempted to contact Mother to see J.J., was unsuccessful in reaching Mother, went back to Beech Hollow on September 15th, and did not see Mother at the Beech Hollow address. He testified that he tried to make phone calls and determine Mother's location but was unable to make contact with her. When asked why he agreed with the court's order that Mother complete certain services, GAL Huff answered:

> Because I had a concern about what I would consider the homelessness and the substance abuse regarding the children. That has been one issue because the thing is, I had not been able to get a hold of [Mother]. It seems like she's been somewhat evasive regarding from the beginning of this case and that is a concern because my child – my children that I deal with, need stability. That is one of the main reasons.

*Id.* at 33. While Mother testified that she was living at the same Beech Hollow address, GAL Huff testified that he was confident that Mother was not living at the Beech Hollow address when he left that address on September 15th and

FCM Fuyana testified that she made three attempts to visit Mother at the Beech Hollow address in September 2017.

[33] As for Mother's employment and financial situation, Mother testified that she did not have a job at the moment. Smith testified that Mother told her that she was having issues paying for the motel and asked to borrow some money.

[34] With respect to her supervision and parenting skills, Smith, the home based case manager, testified that there was "some lack in parenting" being able to manage both children at the same time, that K.J. walked off a couple of times in the parking lot because Mother struggles with the "logistics of getting both kids to the car," and that she had to ask Mother "maybe at least four times" to "go grab [K.J.] and see where he's at." Transcript Volume II at 70-72.

[35] We note that Mother does not challenge the court's findings relating to her failure to comply with services. Rather, Mother asserts that it is not surprising that she showed little willingness to work with service providers given the history of her initial encounter "and the ongoing knowledge that any disclosure she makes to [DCS] or its contractors may be used against her and in support of removal of her children." Appellant's Brief at 38.

## *Conclusion*

[36] Based upon the evidence and testimony presented at the fact-finding hearing and in light of the unchallenged findings, we cannot say that the trial court's findings of fact, conclusions, and judgment are clearly erroneous. The evidence supports the conclusion that the Children are CHINS.

[37] For the foregoing reasons, we affirm the trial court's conclusion that the Children are CHINS.

[38] Affirmed.

Altice, J., and Tavitas, J., concur.