

FILED

Feb 19 2018, 8:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Andrew Bernlohr
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of E.Y., Child in Need of Services,<br><br>and<br><br>U.F. (Mother),<br><br>*Appellant-Respondent,*<br><br>v.<br><br>Indiana Department of Child Services,<br><br>*Appellee-Petitioner.* | February 19, 2018<br><br>Court of Appeals Case No. 49A02-1707-JC-1634<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Marilyn A. Moores, Judge<br><br>The Honorable Beth L. Jansen, Magistrate<br><br>Trial Court Cause No. 49D09-1702-JC-422 |

**Najam, Judge.**

## Statement of the Case

U.F. ("Mother") appeals the trial court's adjudication of her son, E.Y. ("Child"), as a child in need of services ("CHINS"). Mother raises a single issue for our review, namely, whether the trial court erred when it found that Child is a CHINS. We reverse.

## Facts and Procedural History

Mother is the sole adoptive parent of Child, who was born on November 13, 2006. On February 3, 2017, Detective Joshua Morgan, an officer with the behavioral health unit of the Indianapolis Metropolitan Police Department ("IMPD"), and Tammy Johnson, a mobile crisis specialist with Eskenazi Hospital, went to a hotel room where Mother and Child were living. Detective Morgan had been alerted by someone that Mother might be in crisis, and so he had contacted her by telephone to see whether she needed any help. Mother initially denied needing help, but she proceeded to leave Detective Morgan twenty-five voice mails over the following two days, which led Detective Morgan and Johnson to make the in-person visit.

When Detective Morgan and Johnson arrived at the hotel room, Child was at school, and Mother was packing their things to move to another hotel. Mother stated that they were "no longer welcome" at that hotel. Tr. at 10. Mother also stated that she "was hearing voices through the TV from a former employer[.] [S]he couldn't really make out what the voices were saying to her, but that they were following her wherever she was going." *Id.* at 11. Detective Morgan and

Johnson "thought that [Mother] was suffering from a mental illness" and transported her to Eskenazi for an evaluation. *Id.* Detective Morgan contacted Child's maternal grandmother and arranged for her to pick up Child from school that day.

[4] Jamie Hobbick, Family Case Manager ("FCM") for the Department of Child Services ("DCS"), interviewed Mother at the hospital and spoke with Child at a DCS office. After talking to Child, Hobbick took Child to Riley Children's Hospital for treatment for his asthma. Child did not have any medication for his asthma at that time.

[5] DCS placed Child in foster care and filed a petition alleging that Child was a CHINS because Mother was hearing voices and did not have stable housing. After an initial hearing on the CHINS petition on February 8, the trial court "authorize[d] DCS to put in place any services that [M]other might want to participate in."[1] Appellant's App. at 32. Accordingly, DCS referred Mother to home-based services "to stabilize her home and to ensure that she had employment." Tr. at 32. Velma Bond, a home-based case manager, thereafter attempted to contact Mother several times, but Mother never attended any sessions with Bond. Accordingly, Bond discharged Mother for

---

[1] Indiana Code Section 31-34-16-3 provides for parental participation orders, which may include participation in mental health treatment. But those orders are authorized only *after* a child has been adjudicated a CHINS. Here, because the CHINS petition was only pending, the trial court was not authorized by statute to order Mother to participate in services.

"noncompliance" with the recommended, but not court-ordered, home-based services. *Id.* at 33.

[6] Carla Davenport, a home-based therapist, supervised eight visits between Mother and Child beginning in April 2017. Davenport observed that

> [t]here is not a lot of interaction between [Mother] and her son. It is interaction when it is necessary. She does take him to go eat. She takes him to get haircuts, she takes him to the library and things like that, but there is not a lot of talking or affection or any of that stuff during the visits.

*Id.* at 22. Davenport further thought that Mother needed a psychological evaluation "to get a little bit deeper down to find out what is going on." *Id.* at 23. Davenport, a therapist who is not qualified to make medical diagnoses, observed that

> there are times that [Mother] will shake her head and she will kind of laugh to herself, there are times when—it kind of seems like she is not there at the time, or she is off somewhere else in her mind. It pretty much looks like a schizophrenic diagnosis to me.

*Id.* at 24. But, despite her apparent concerns, Davenport did not refer Mother for a psychological evaluation. Instead, Davenport opined that Mother would not submit to an evaluation unless the court ordered one.

[7] Following a fact-finding hearing on the CHINS petition on May 11, the trial court found that Child was a CHINS and entered the following findings and conclusions:

FINDINGS OF FACT

The Court finds the following by preponderance of the evidence:

1. All events in the Petition occurred in Marion County, Indiana.

2. Parties stipulated that the age and date of birth of the child is correct as listed in the petition and that mother is [E.F.]. The parties further stipulate that this is single parent adoption, therefore there is no Father.

3. Detective Morgan is a detective with the behavioral health unit of IMPD. While in the course of his duties[,] he has come into contact with the Mother . . . on multiple occasions. The first contact being in February of 201[7]. After receiving multiple voice mails from Mother he went to the hotel where Mother was living. Mother was mentally unstable and this is evidenced by her statements that she was hearing voices from the TV. Mother claimed that these voices were from former employer and the voices would follow her from the television. At that time, Mother was caring for the child and did not have a satisfactory plan to care for the child because she was being forced out of the hotel, did not have job, and was suffering from mental illness and was not being properly medicated.

4. Detective Morgan involuntarily detained Mother as a result the danger she presented to herself and the child.

5. CPS investigator Hobbick conducted an investigation after receiving information from IMPD. After speaking to all parties and hospital staff, the child was taken into custody after receiving necessary medical treatment.

6. The child was removed from Mother's care as a result of Mother's mental illness and lack of stable living environment.

7. Ms. Carla Davenport has been working with the Mother as home-based therapist and visit supervisor since April of 2017. Mother has mental health needs and would benefit from mental health evaluations but she is not cooperative and will not participate in such treatment unless the coercive intervention of the Court is present.

8. Mother's parenting is suspect and deficient as a result of her mental illness.

9. Continued supervised time is needed and Mother needs more intensive therapy.

10. Velma Bond was assigned to work with Mother as her home-based case manager but Mother has not been cooperative or compliant thereby necessitating coercive intervention of the Court.

11. The services needed for the child's well-being include continued out of home placement, mental health treatment for Mother and home-based case management to assist in obtaining and maintaining stable housing, and home-based therapy to ensure continuing mental health needs are met.

CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and subject matter pursuant to Indiana Code §31-30-1-1(2) and Indiana Code §31-30-2-1.

2. All events in the Children In Need of Services Petition and the CPS investigation occurred in Marion County, Indiana.

3. This child is a child in need of services and DCS has shown that by a preponderance of the evidence.

4. The child needs care and treatment that will not be provided without the coercive intervention of the Court.

Appellant's App. at 57-58. The trial court held a dispositional hearing on June 22. This appeal ensued.

# Discussion and Decision

[8] Mother contends that DCS failed to present sufficient evidence to demonstrate that Child is a CHINS. Our Supreme Court has recently set out our standard of review.

> When reviewing a trial court's CHINS determination, we do not reweigh evidence or judge witness credibility. *In re S.D.*, 2 N.E.3d 1283, 1286 (Ind. 2014). "Instead, we consider only the evidence that supports the trial court's decision and [the] reasonable inferences drawn therefrom." *Id.* at 1287 (citation, brackets, and internal quotation marks omitted). When a trial court supplements a CHINS judgment with findings of fact and conclusions law, we apply a two-tiered standard of review. We consider, first, "whether the evidence supports the findings" and, second, "whether the findings support the judgment." *Id.* (citation omitted). We will reverse a CHINS determination only if it was clearly erroneous. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). A decision is clearly erroneous if the record facts do not support the findings or "if it applies the wrong legal standard to properly found facts." *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997) (citation omitted).

*Gr.J. v. Ind. Dep't. of Child Servs. (In re D.J.)*, 68 N.E.3d 574, 577-78 (Ind. 2017) (alterations in original).

[9]     Here, Mother contends the trial court erred in adjudicating Child a CHINS because there was no evidence that: Child was seriously endangered as a result of Mother's apparent mental illness; Child's needs were unmet; or Child's needs would go unmet in the absence of the coercive intervention of the court. We must agree.

[10]    In *J.M. v. Indiana Department of Child Services (In re N.C.)*, 72 N.E.3d 519, 524 (Ind. Ct. App. 2017), this court reiterated that

> [t]he purpose of a CHINS inquiry is to determine whether a child's circumstances require services that are unlikely to be provided without the intervention of the court, and thus, *the focus of a CHINS adjudication is on the condition of the child alone*, not on the culpability of one or both parents. *In re N.E.*, 919 N.E.2d 102, 105-06 (Ind. 2010). Nonetheless, "[n]ot every endangered child is a child in need of services, permitting the State's *parens patriae* intrusion into the ordinarily private sphere of the family." *In re S.D.*, 2 N.E.3d [at] 1287[.] Rather, a CHINS adjudication under section 31-34-1-1 requires proof of three basic elements: the parent's actions or inactions have seriously endangered the child; the child's needs are unmet; and "perhaps most critically," those needs are unlikely to be met unless the State intervenes. *Id.* It is the last element that guards against unwarranted State interference in family life. *Id.* State intrusion is warranted only *when parents lack the ability to provide for their children*. *Id.* Moreover, when determining whether a child is a CHINS under section 31-34-1-1, and particularly when determining whether the coercive intervention of the court is necessary, the juvenile court "*should* consider the family's condition not just when the case was filed, but also when it is heard." *Id.* at 1290.

(Emphases added.)

[11] Initially, we note that DCS provided no evidence that Mother has ever been diagnosed with or treated for a mental illness. Indeed, DCS did not even refer Mother for a psychiatric evaluation. That being said, for purposes of this appeal, we will assume, based on the undisputed evidence that Mother was hearing the voice of a former employer coming through her television in early February 2017, that, at that time, Mother was likely suffering a mental illness. But DCS presented no evidence that Mother continued to have that specific delusion at the time of the fact-finding hearing. Rather, DCS presented Davenport's testimony that, during the more recent supervised visits, Mother was not affectionate with Child and *appeared* to suffer from schizophrenia. However, again, there was no evidence that a medical diagnosis had been made[2] or that treatment had been prescribed for Mother.

[12] In any event, again, it is well settled that "the focus of a CHINS adjudication is on the condition of the child alone." *In re N.C.*, 72 N.E.3d at 524. And here, DCS presented no evidence relevant to the impact, if any, of Mother's mental illness on Child's condition.[3] Indeed, the evidence does not support a reasonable inference that, at the time of the fact-finding hearing, Mother's mental health endangered Child at all, let alone that her mental health *seriously* endangered him. *See id.* To the contrary, Davenport expressly acknowledged

---

[2] Davenport acknowledged in her testimony that she was not qualified to make diagnoses.

[3] We note that, in the context of the termination of parental rights, a parent's mental illness, without more, is not grounds for terminating parental rights. *See, e.g.*, *A.A. v. Ind. Dep't. of Child Servs. (In re V.A.)*, 51 N.E.3d 1140, 1148 (Ind. 2016).

that Mother was meeting Child's needs. And while Davenport testified that Mother did not interact with Child other than to provide for his needs, there was no evidence regarding what that lack of interaction or lack of affection meant in terms of any harm to Child. As our Supreme Court has recognized, "it is an unfortunate instance for any child to experience the 'emotional turmoil' and difficulties of living with a parent suffering from mental illness[.]" *In re V.A.*, 51 N.E.3d at 1148. But that does not mean that a parent's mental illness necessarily presents a serious danger to a child.

[13] While Detective Morgan testified that, in February 2017, he believed that Mother "was a danger to herself and her son" because of her delusions, Detective Morgan did not explain the basis for that opinion and, in any case, there was no evidence that Mother presented any danger to either herself or her son at any time after Detective Morgan's interaction with Mother in early February 2017. Tr. at 12. As our Supreme Court recently noted, "[w]hen determining CHINS status under Section 31-34-1-1, particularly the 'coercive intervention' element, courts 'should consider the family's condition not just when the case was filed, but also when it is heard.' Doing so avoids punishing parents for past mistakes when they have already corrected them." *In re D.J.*, 68 N.E.3d at 580-81 (quoting *In re S.D.*, 2 N.E.3d at 1289-90). Here, without any evidence that Mother posed a danger to Child after Detective Morgan met

Mother in early February 2017, we cannot say that the evidence supports the CHINS finding.[4]

[14] In addition to Mother's mental illness, DCS and the trial court cited Mother's lack of stable housing as a reason for the CHINS finding. But, while DCS presented evidence that, on February 3, Mother was forced to leave the hotel where she and Child were living, the undisputed evidence shows that Mother had money and planned to move to another hotel that day. DCS presented no evidence that Mother and Child were homeless or that Mother moved around from place to place other than on that one occasion. Indeed, FCM Hobbick testified as follows:

> Q: So since February eighth, you haven't had any contact with [M]other?
>
> A: No.
>
> Q: Since that point in time, you haven't viewed her home environment?
>
> A: No.
>
> Q: You don't know where she is living?
>
> A: No.
>
> Q: You don't know whether it is appropriate for the child?

---

[4] We note that, other than Child not having medication for his asthma in February 2017, there is no evidence that Mother failed to provide appropriate medical care for Child.

A: Nope.

Tr. at 20.[5]  Although the trial court may have been concerned that, at some point, Mother would run out of money or would be forced to leave hotels with some frequency because of her mental illness or some other reason, DCS simply did not present any such evidence at the fact-finding hearing.  *See J.J. v. Ind. Dep't of Child Servs. (In re K.S.)*, 78 N.E.3d 740, 745 (Ind. Ct. App. 2017) (holding trial court could only speculate that mother and child would be unable to live with mother's cousin long-term and noting that future concerns rather than present facts are not enough to support a CHINS adjudication).  The evidence was insufficient to show that Mother lacked stable housing.  *See id.*

[15]     As set forth in the relevant CHINS statute, it is DCS's burden to prove that a parent's actions or inactions have seriously endangered her child and that the child's specific needs have not been met.  *Id.*  And as our Supreme Court has held, "State intrusion is warranted only when parents lack the ability to provide for their children."  *In re N.C.*, 72 N.E.3d at 524.  Here, DCS did not present evidence to support a reasonable inference that Mother's mental illness impaired her ability to provide for Child or that Child was harmed as a result of Mother's mental illness.  Thus, DCS did not sustain its burden to show that Child was seriously endangered as a result of Mother's mental illness, that his

---

[5] Further, neither Mother's purported lack of contact with DCS nor her "noncompliance" with DCS's services supports the trial court's judgment.  The trial court's order from the initial hearing only compelled Mother to participate in services that she "might want to participate in," which did not compel Mother to participate with DCS at all.  Appellant's App. at 32.

needs were unmet, or that his needs would go unmet in the absence of the coercive intervention of the court.

[16] We hold that the trial court clearly erred when it found Child to be a CHINS. We acknowledge the concern expressed by the dissent that we err on the side of caution, especially where the parent is uncooperative with the DCS investigation. But a CHINS finding must be fact-based, and here the evidence is insufficient to support the finding. And, while we share the trial court's concern that Mother needs treatment for her mental illness, without evidence to support a CHINS determination, neither DCS nor our courts can compel such treatment.

[17] Reversed.

Mathias, J., concurs.

Barnes, J., dissents with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of E.Y., Child in Need of Services,

and

U.F. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

Court of Appeals Case No. 49A02-1707-JC-1634

**Barnes, Judge, dissenting.**

[18] I respectfully dissent. I am not opposed to reversing a CHINS adjudication when the evidence to support it is entirely lacking. *See J.M. & T.K. v. Indiana Dep't of Child Servs.*, 83 N.E.3d 1256 (Ind. Ct. App. 2017) (authoring opinion reversing CHINS adjudication), *trans. denied*; *J.M. v. Indiana Dep't of Child Servs.*, 72 N.E.3d 519 (Ind. Ct. App. 2017) (concurring in opinion reversing CHINS adjudication). I also would admit that the evidence here was not the strongest.

But, I believe it was sufficient to meet DCS's burden of proving by a preponderance of the evidence that E.Y. is a CHINS.

[19] The first element of the CHINS case that DCS had to prove here, aside from E.Y.'s age, was whether E.Y.'s physical or mental condition was seriously impaired or endangered by Mother's inability, refusal, or neglect to supply E.Y. with necessary food, clothing, shelter, medical care, education, or supervision. *See Gr.J. & J.J. v. Indiana Dep't of Child Servs.*, 68 N.E.3d 574, 580 (Ind. 2017) (quoting Ind. Code § 31-34-1-1). It is true that there is a lack of direct evidence that E.Y. was suffering emotionally or physically at the time of the CHINS hearing or at any time. However, "the CHINS statute does not require the juvenile court and DCS to wait until a child is physically or emotionally harmed to intervene; rather, a child may be determined to be a CHINS if his or her physical or mental condition is endangered." *K.B. v. Indiana Dep't of Child Servs.*, 24 N.E.3d 997, 1003 (Ind. Ct. App. 2015).

[20] There was evidence here that when police and DCS first encountered Mother, she was unemployed and hearing voices of her former employer coming from a TV set. She and E.Y. were being forced out of the hotel where they were currently living; even if Mother had another place to stay, this along with her lack of employment is indicative of an unstable lifestyle that could seriously endanger E.Y. E.Y. was taken by DCS to the hospital at that time for treatment of his asthma, which was not being properly treated while in Mother's care. An untreated serious medical condition like asthma poses a great risk to a child.

The majority correctly notes that evidence regarding Mother and E.Y.'s situation at the time of the CHINS hearing itself, three months after the petition was filed, is lacking. I agree that usually we are supposed to consider the evidence at the time of hearing, not just the filing of the petition. This lack of evidence, however, can be chalked up to Mother's refusal to cooperate and communicate with DCS. DCS caseworker Tianna Ceaser, who took over the case at the end of March or approximately six weeks before the CHINS hearing, testified that she attempted to call Mother five or six times, that she only was able to speak with Mother possibly twice, and one of those times Mother told her she had the wrong number and hung up. Mother also was referred to a home-based therapist, who at the time of the CHINS hearing was preparing to discharge Mother from the program because of her complete noncompliance with it; the therapist was never able to schedule an appointment with Mother despite nine attempts to do so over a one-month period. Under the circumstances, I believe it is proper to focus primarily on the available evidence from the time of the filing of the CHINS petition, and not "reward" stonewalling by lack of action.

I reach a similar conclusion regarding Mother's mental health. The fact that she never was diagnosed by a medical professional as suffering from a mental illness does not mean that we should ignore the observations by the police detective, who was told by Mother that she was hearing strange voices coming from the TV, and the visitation coordinator's suspicion that Mother had mental health problems after observing her interaction and lack of interaction with

E.Y. Given their observations, it was entirely reasonable for DCS to request that Mother undergo a psychological evaluation. She refused to voluntarily do so. I believe the majority places DCS in the impossible situation of having good reason to suspect Mother has a mental illness but lacking the means to prove that she has one because there is no CHINS finding and it cannot force Mother to undergo a psychological evaluation and, therefore, it cannot prove E.Y. is a CHINS.[6] I believe it prudent to err on the side of caution and not to allow a potentially dangerous situation to fester.

[23] Mother's refusal to cooperate with DCS in this and other matters is evidence that the coercive intervention of a court is necessary to ensure E.Y.'s care and well-being, which is another element of a CHINS proceeding. *See Gr.J. & J.J.*, 68 N.E.3d at 580. This lack of cooperation also distinguishes this case from the *J.M. & T.K.* case, in which the parents fully cooperated with DCS after the filing of the CHINS petition. *See J.M. & T.K.*, 83 N.E.3d at 1262. I believe we should defer to the trial court's judgment here and affirm its finding that E.Y. is a CHINS.

---

[6] I also do not believe that the fact that a parent's mental illness alone cannot support a termination of parental rights, as noted by the majority, means such illness cannot be considered in a CHINS proceeding, which has different goals and a lower burden of proof.