## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 09 2019, 8:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Rory Gallagher
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of:
B.G. (Minor Child), Child in Need of Services,

and

C.G. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

August 9, 2019

Court of Appeals Case No.
19A-JC-4

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge
The Honorable Beth L. Jansen, Magistrate

Trial Court Cause No.
49D09-1808-JC-2132

**Baker, Judge.**

[1] C.G. (Mother) appeals the juvenile court's order finding her child, B.G. (Child), to be a child in need of services (CHINS). Mother argues that the evidence is insufficient to support the CHINS adjudication. Finding the evidence sufficient, we affirm.

## Facts

[2] Mother has a history with the Department of Child Services (DCS). In 2012, DCS filed a petition alleging that Mother's two oldest children were CHINS because of Mother's untreated mental health issues.[1] In June 2016, Mother admitted that her three older children were CHINS because she needed "assistance in maintaining stable mental health and suitable and appropriate housing." Appellant's App. Vol. II p. 93. Mother failed to participate with court-ordered services in that case and, in May 2017, the juvenile court changed the permanency plan for her oldest three children from reunification to adoption. In June 2017, DCS filed a petition to terminate the parent-child relationship between Mother and at least one of those children. The status of the termination case is not revealed by the record; however, the CHINS case remained open throughout the instant proceedings.

[3] Mother gave birth to Child on June 10, 2018. Two days later, DCS removed Child from Mother's care and custody and placed her in relative care. DCS filed a petition alleging Child to be a CHINS. On August 1, 2018, Child's

---

[1] The record does not reveal the outcome of this proceeding.

Father confined Mother and one of her other children in a bedroom. Mother called the police. Father threw an object into the wall, resulting in a hole in the wall, pushed Mother into the closet door, and may have injured the child. When police arrived, he answered the door with a knife in his hand. Father, who is not participating in this appeal, was incarcerated on charges stemming from that incident at the time of the CHINS factfinding in this case.

[4] The CHINS case proceeded to a factfinding hearing on August 9, 2018. Partway through the hearing, the juvenile court granted DCS's motion to continue over Mother's objection, but did not set a new hearing date. On August 15, 2018, Mother filed a motion to dismiss the CHINS petition based on a failure to comply with statutory deadlines. The juvenile court granted the motion to dismiss on August 23, 2018.[2]

[5] On August 24, 2018, DCS filed a new petition alleging Child to be a CHINS based on Mother's untreated mental health issues, a failure to participate with service providers in her other open CHINS case, and the August 1 domestic violence incident.[3] The factfinding hearing took place on October 22, 2018.

[6] At the hearing, Mother admitted that she had been diagnosed with borderline personality disorder, bipolar disorder, schizoaffective disorder, and severe

---

[2] Mother asks that we take judicial notice of the record in the dismissed CHINS case; DCS objects. By separate order, we grant the motion, but only to the extent of the dates of the relevant court proceedings—which, in any event, is all Mother was requesting.

[3] Mother explicitly stated that she is not making a res judicata argument that the second CHINS petition is impermissibly based solely on the allegations of the first CHINS petition. Appellant's Mtn. to Strike p. 5.

depression. Dr. Mukesh Desai, a staff psychiatrist with Midtown Mental Health, testified that he had diagnosed Mother with schizoaffective disorder and borderline personality disorder in July 2018. He had prescribed Mother Latuda, a mood stabilizer, but she failed to return for follow-up appointments in September and October to check on the effectiveness of the medication. She had not refilled the Latuda prescription and it would have run out before the factfinding hearing.

[7] Dr. Desai testified that it is critical that Mother return for follow-up appointments, follow a medication management plan, and regularly attend individual therapy. Her borderline personality disorder, if untreated, causes her to be volatile and unpredictable. And her schizoaffective disorder causes moods that alternate between depressed and manic; it also causes auditory or visual hallucinations. A person who has these co-existing conditions but fails to treat them will become gravely compromised in their ability to parent. Patients with these mental health conditions lose emotional control when experiencing relatively minor frustrations and moments of ambiguity, both of which are frequent parts of parenting children, especially infants.

[8] At the appointment when Dr. Desai prescribed Latuda for Mother, she became extremely agitated because she wanted a different medication; he had to call security before she began to calm down. At an October 1, 2018, child and family team meeting, Mother became extremely agitated and erratic, storming out repeatedly and making statements suggesting to some of those present that she planned to harm or kill herself. Mother's family case manager (FCM)

reported that at a home visit three days before the factfinding, Mother became very agitated, could not control her behavior, and lost emotional control when something did not go the way she had hoped. The FCM explained that Mother was "explosive in a manner that was concerning." Tr. Vol. II p. 109.

[9] Mother's home-based therapist testified at the factfinding hearing, explaining that the service was closed unsuccessfully after she began refusing to work with him. He was concerned about Mother's episodes of paranoia, inability to remember information, and episodes of extreme agitation. He recommended that she undergo a mental health evaluation.

[10] Mother visited with Child inconsistently from June 11 through August 6, 2018. Simon Gelaye was the visit facilitator, reporting that Mother often displayed concerning behavior. She fell asleep while Child was sleeping in her arms and failed to support the newborn infant's head properly. She struggled to calm down before and during parenting time. Gelaye considered ending at least one visit early because Mother struggled to calm herself. Mother missed multiple visits because she failed to wake up on time, and Gelaye became concerned that she would not be able to wake up if Child needed care or attention. Many visits ended early.

[11] Sheryl Alexander supervised parenting time between Mother and Child between August and October 2018. Alexander observed Mother getting agitated with Gelaye on one occasion and observed combative behaviors at child and family team meetings, but did not observe any troubling behavior

during visits. Alexander observed that Mother was nurturing and attentive to Child and testified that she did not have any safety concerns about Mother's parenting. She recommended that Child be placed with Mother. Alexander admitted that if Mother's mental health issues were untreated, she would have safety concerns about Mother's parenting abilities, but she chose to believe Mother's statements that she was receiving treatment.

[12] Mother testified about the domestic violence incident between herself and Father. She explained that she called the police because the injured child had asked Father to leave and he refused. She denied that she had ever been in a domestic violence incident with Father and testified that she did not "have plans" to live with Father "at this time." *Id.* at 41, 53. Mother would not say that she would never live with Father again. *Id.* at 53.

[13] Mother began to exhibit paranoia about Father. In September 2018, Mother called the police and reported that she thought Father had asked someone to come watch her home and vandalize her car. Mother told Alexander that they needed to be aware of their surroundings when they left a visit together because Father had sent people to follow them. Alexander asked Mother if she had a protective order and Mother replied that she did not. Alexander found this behavior concerning enough that she reported it to a DCS supervisor.

[14] On December 4, 2018, the juvenile court found Child to be a CHINS. In relevant part, it found as follows:

10. Mother does not demonstrate an awareness of the current state of affairs. Mother has issues processing and her testimony is convoluted and shows that she has mental health issues. Mother does not appreciate that she was court ordered to participate in services for her older children. Mother erroneously believes that she successfully completed services for the older children yet at one time their plan of permanency was changed to adoption.

11. Mother['s] testimony is convoluted and contradictory and the Court finds her incredible.

12. Mother has been diagnosed with personality disorder, schizo-affective disorder, [and] severe depression. These are long-standing mental health issues that are not successfully addressed as of yet.

\*\*\*

15. Mother denies that there was any domestic violence between herself and the Father, which shows that she is not attuned to reality. . . .

16. The inability of Mother to recognize domestic violence and its toxic effects on all involved pose a danger to the safety and well-being of any child placed in her care.

\*\*\*

18. Mother has had multiple service providers under the JC cause for her older children and she has not complied with any service providers.

19.    Although Mother has the ability to meet with mental health professional and she does on occasion, her mental health is concerning for dealing with any type of conflict and would make parenting an infant difficult.

20.    Mother's current claim of willingness to participate in services and mental health treatment does not satisfy this Court's concerns about the necessity of coercive intervention especially in light of this Court's prior findings for older children and Mother's continued denial as to this petition.

*** 

24.    With Mother's mental health diagnosis, the concerns are Mother's volatile presentation and how it affects the ability to parent. Mother's ability to safely parent will be significantly compromised by her mental health issues and her inability to meet with service providers and satisfy them. The ability to safely parent could be compromised because of the stresses that parenting presents.

*** 

33.    [The Guardian ad Litem (GAL)] does not believe it is in [Child's] best interests to be placed in her Mother's care because of Mother's unstable mental health and the serious safety risks that [it] presents. [The GAL] has seen concerning erratic behaviors by Mother which preclude her from properly parenting this child and the older children as well.

***

36.   [Mother's erratic and volatile behavior] is concerning because much of parenting is dealing with the frustrations [that] children present.

37.   Mother has NOT been cooperative or compliant and has not shown that she is medically compliant and has not shown that she is addressing her mental health issues.

38.   . . . Although Ms. Alexander stated she has no safety concerns for Mother's parenting[,] she has seen Mother's behavior become problematic when confronted with frustrating situations, which lead this Court to have safety concerns for this child in the care of Mother.

Appellant's App. Vol. II p. 93-95.  On December 4, 2018, the juvenile court held a dispositional hearing and ordered Mother to participate with home-based therapy, complete an assessment for domestic violence services and follow all recommendations, and either complete a psychological assessment or provide a copy to DCS of a psychological evaluation that had been completed in the preceding twelve months.  Mother now appeals.

## Discussion and Decision

[15]   Our Supreme Court has explained the nature of a CHINS proceeding and appellate review of a CHINS finding as follows:

> A CHINS proceeding is a civil action; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.E.,* 919 N.E.2d 102, 105 (Ind. 2010).  We neither reweigh the evidence nor judge the credibility of the witnesses. *Egly v. Blackford County Dep't of Pub. Welfare,* 592 N.E.2d 1232, 1235 (Ind. 1992).  We consider

only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. *Id.* We reverse only upon a showing that the decision of the trial court was clearly erroneous. *Id.*

There are three elements DCS must prove for a juvenile court to adjudicate a child a CHINS. DCS must first prove the child is under the age of eighteen; DCS must prove one of eleven different statutory circumstances exist that would make the child a CHINS; and finally, in all cases, DCS must prove the child needs care, treatment, or rehabilitation that he or she is not receiving and that he or she is unlikely to be provided or accepted without the coercive intervention of the court. *In re N.E.,* 919 N.E.2d at 105.

*In re K.D.,* 962 N.E.2d 1249, 1253-54 (Ind. 2012) (footnote omitted).

[16] Here, DCS alleged that Child was a CHINS pursuant to Indiana Code section 31-34-1-1, which provides as follows:

A child is a child in need of services if before the child becomes eighteen (18) years of age:

(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

Our Supreme Court has interpreted this provision to require "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.D.,* 2 N.E.3d 1283, 1287 (Ind. 2014).

[17] Here, Mother argues that the evidence was insufficient to establish that Child's physical or mental condition was seriously endangered as a result of Mother's mental health issues or of the domestic violence in the family.[4][5]

[18] Turning first to Mother's mental health issues, she insists that the juvenile court focused impermissibly on a concern that Mother's mental health *could* seriously endanger Child in the future rather than a finding that Child *is currently* seriously endangered. We agree with Mother that this would, indeed, be an impermissible concern on which to base a CHINS adjudication. Here, however, the record is replete with evidence showing that Child would be

---

[4] DCS spends much of its brief responding to an argument that Mother did not make—namely, that the juvenile court erred in considering Mother's history of mental illness, DCS involvement, and domestic violence. Appellee's Br. p. 19-27. Mother has moved to strike this portion of the brief. By separate order, we deny that motion, as DCS is free to frame the issues as it wishes. We agree with Mother, however, that this portion of DCS's brief seems to be a proverbial ship passing Mother's actual argument in the night.

[5] To the extent that Mother may be arguing that the evidence did not show that the coercive intervention of the court was necessary, we note that the fact that she was failing to participate with court-ordered services in her other CHINS case dramatically undercuts this argument. Moreover, beyond her own testimony, which the trial court found to be not credible, there is no evidence in the record that she was participating with mental health treatment of her own volition.

seriously endangered, right now, if she were placed in Mother's care and custody.

- Mother had an open CHINS case at the time of this factfinding for her three older children. In that case, she had failed to participate with services, her children were not placed with her, and their plan of permanency had been changed to adoption.
- Mother has multiple, serious mental health diagnoses. Beyond her own claims, which the juvenile court explicitly found to be not credible, there is no evidence in the record that she is currently receiving treatment, including either medication or therapy, for those conditions.
- A patient with those co-existing conditions who fails to treat them is gravely compromised in her ability to parent because she will lose emotional control when experiencing minor frustrations.
- There are multiple examples in the record of Mother losing emotional control, including episodes of volatility, agitation, and explosive behavior. The most recent incident occurred just days before the factfinding hearing.
- Mother's first visitation supervisor reported that Mother's behavior during visits was concerning. She struggled to calm herself down before and during parenting time. She fell asleep holding Child and failed to support the infant's head properly. She missed multiple visits because she failed to wake up on time.
- Mother's second visitation supervisor did not have concerns about Mother's behavior during visits, but she did observe volatile behavior from Mother on other occasions. She also testified that, while Mother had reported to her that she was receiving mental health treatment, she would have safety concerns about Mother's parenting if her mental health issues were untreated.
- The GAL had been working with Mother's older children in the other CHINS case and believed that Child would be seriously endangered if placed in Mother's care based on Mother's erratic behavior and unstable mental health.

While Mother seeks to minimize this evidence by conceding that she sometimes "lose[s] her temper, raise[s] her voice, or address[es] others in a demanding tone," appellant's br. p. 15, we are not persuaded with this characterization of the record, nor does this comply with our standard of review. Additionally, in emphasizing the more positive testimony of the second visitation supervisor while overlooking much of the more negative testimony, Mother asks us to reweigh the evidence, which we may not do.

[19] This Court has noted that a parent's mental illness, in and of itself, does not necessarily present a serious danger to the child. *In re E.Y.*, 93 N.E.3d 1141, 1146 (Ind. Ct. App. 2018). Here, however, it is not the mere fact of Mother's mental illness that supports the CHINS finding. Instead, it is the manifestation of that mental illness, including volatile and explosive behavior and an inability to handle minor frustrations with emotional control. Unless and until Mother is in regular mental health treatment that is helping her to regulate her emotions, we have little difficulty finding that the juvenile court reasonably concluded that Child would be seriously endangered if placed in Mother's care and custody. *See In re K.P.G.*, 99 N.E.3d 677, 684 (Ind. Ct. App. 2018) (noting that an inability or unwillingness to address mental illness when it creates an unsafe environment is proof of serious endangerment).

[20] With respect to the domestic violence issue, we note that it appears that Mother was a victim and called the police to report the altercation, leading to Father's arrest and incarceration. We would certainly not find this incident, in and of itself, sufficient to support a CHINS adjudication. What concerned the juvenile

court, however, was that at the factfinding hearing, Mother denied that any domestic violence had ever occurred between her and Father and, while she stated that she did not have plans to live with Father again, she refused to rule out the possibility categorically. It was Mother's "inability . . . to recognize domestic violence and its toxic effects on all" that formed part of the basis of the CHINS finding, rather than the incident itself or her decision to report it. Appellant's App. Vol. II p. 93. While this evidence, alone, would not have sufficed to support a CHINS finding, we find that it was not erroneous for the juvenile court to consider it along with all the other evidence in finding that Child was a CHINS.

[21] It is undeniable, based on the record, that Mother and Child have a bond and that Mother genuinely loves her daughter. We hope that the services offered in the CHINS case will enable Mother to reach a place where she can safely and appropriately parent her child.

[22] The judgment of the juvenile court is affirmed.

Vaidik, C.J., and Altice, J., concur.