## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Nov 21 2019, 8:56 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Valerie K. Boots
Steven J. Halbert
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

Dede K. Connor
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of:

M.M. (Minor Child)

*Child in Need of Services*

M.M. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner,*

November 21, 2019

Court of Appeals Case No. 19A-JC-1308

Appeal from the Marion Superior Court

The Honorable Mark Jones, Judge

The Honorable Rosanne Ang, Magistrate

Trial Court Cause No. 49D15-1812-JC-2995

And

Child Advocates, Inc.,

*Appellee-Guardian ad Litem.*

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, M.M. (Mother), appeals the trial court's adjudication that her minor child, Mi.M. (Child), is a Child in Need of Services (CHINS).

We affirm.

# ISSUES

Mother presents two issues on appeal, which we consolidate and restate as the following single issue: Whether the trial court erred in determining Child to be a CHINS.

# FACTS AND PROCEDURAL HISTORY

Mother is mother to Mi.M, born on March 22, 2006. On December 4, 2018, the Department of Child Services' (DCS) Family Case Manager (FCM) Monay Cavazos (FCM Cavazos) assessed an allegation of neglect. The report received by DCS alleged that Mother believed someone was going to kill her and Child,

that Mother is mentally ill, and that Child had missed thirteen days of school. When FCM Cavazos arrived at the residence, the police were already present and in the process of removing a gun from the home. The officers detained Mother for a mental health assessment and DCS detained the Child.

[5] Within two hours of receiving the report, FCM Cavazos interviewed Mother. Mother confirmed the allegations of the initial report by reiterating her belief that hitmen were going to kill her and Child. Mother explained that she has received private calls for the past two weeks from someone whose number and voice she did not recognize. Later in the conversation, Mother claimed the unknown caller to be her own mother. She suspected that her mother wanted to kill her and Child because Mother was about to receive $750,000 as a settlement in a medical malpractice suit over the death of one of her children in 2009. Upon investigation, DCS discovered that the court had granted summary judgment in favor of the medical respondents in the lawsuit. Mother informed FCM Cavazos that she was diagnosed with PTSD, anxiety, and Lupus, and was prescribed Xanax, Viibryd, and morphine. When FCM Cavazos inquired about the change of locks that she had observed as she arrived at Mother's residence, Mother explained that this was due to a recent attempted burglary of her home.

[6] Although Mother's gun was confiscated by the police on December 4, 2018, Mother obtained another gun by February 2019. On February 22, 2019, she twice shot her neighbor because she was upset with him as he had been making too much noise the night before. On February 25, 2019, the State filed an

Information, charging Mother with aggravated battery, a Level 3 felony, and carrying a handgun without a license, a Class A misdemeanor. Mother requested, and the criminal court ordered, an evaluation to determine Mother's sanity and competency to stand trial. At the time of the CHINS factfinding hearing, Mother was on pretrial release and electronic monitoring.

[7] Sarah Krogulecki (Krogulecki), a home-based therapist, began counseling with Mother in January 2019. During the initial meetings, Mother was pleasant and cooperative. She was talkative and appropriately dressed in "business casual" clothing. (Transcript p. 42). However, on February 21, 2019, during the Child and Family Team Meeting, Krogulecki noted a "market [sic] change in only three days." (Tr. p. 41). Mother was dressed differently, seemed "very tired," had difficulties holding a conversation, was stumbling over her words, and seemed to "fall asleep while we were talking." (Tr. p. 42). Krogulecki explained that "[b]ased on [her] training and education, a market [sic] change in affect is sometimes known as a sign of mental health concerns that are present." (Tr. p. 43). She was unsure whether she was qualified to properly identify all of Mother's needs because she was "someone not trained specifically to work with serious mental health concerns." (Tr. p. 41). Krogulecki recommended further evaluations to better identify possible future concerns and noted that she never observed Mother resistant or otherwise unwilling to participate in a psychological evaluation. Because Krogulecki became concerned for her own safety after Mother's change in behavior, the counseling sessions were stopped.

[8] FCM Timothy Graybeal (FCM Graybeal) began working with Mother in January of 2019. He was convinced Mother needed home-based therapy to address the deaths of three of her children, as well as the placement of the Child out of her care. He recommended that Mother complete a psychological assessment based on his interactions with Mother, Krogulecki's recommendation, and Mother's belief that FCM Graybeal was working for the Federal Bureau of Investigation. Although FCM Graybeal made three referrals for a psychological assessment, none of them were even commenced before the CHINS factfinding hearing.

[9] On March 14, 2019, the trial court conducted a factfinding hearing on DCS's CHINS petition. During the hearing, Mother testified that she did not remember being told to complete a psychological assessment by DCS or the court. She also claimed to have requested a psychological assessment from FCM Graybeal more than twenty times. Although she denied having a mental health diagnosis, she admitted to being depressed and had previously been diagnosed with temporary PTSD. She explained that she had psychological assessments done after the death of each of her three older children. While none of these assessments recommended any treatment, she added that a psychiatrist had prescribed Viibryd to address anxiety attacks and Xanax to help her sleep. She also admitted to taking morphine as a painkiller. On the same day but after receipt of evidence for the factfinding hearing, a colloquy about whether Mother could live with the relative caregiver for Child revealed that Mother had not been visiting with Child or participating in services.

On April 25, 2019, the trial court adjudicated Child to be a CHINS, concluding, in pertinent part, that

> [Child's] physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the [Child's] parent, guardian, or custodian to supply the [Child] with necessary food, clothing, shelter, medical care, education, or supervision. [Mother] has severe mental health needs which have led the DCS and therapist to believe that she suffers from delusions. In December of 2018, [Mother] was in possession of a firearm when she was placed under an immediate detention by law enforcement officers. Additionally, [Mother] has a pending trial on charges involving violence and a firearm which are alleged to have occurred in February of 2019. For her and [Child's] safety, [Mother's] untreated mental health condition needs to be addressed.

> [Child] needs care, treatment, or rehabilitation that the [C]hild is not receiving, and is unlikely to be provided or accepted without the coercive intervention of the [c]ourt. As [Mother] has declined to engage in the psychological evaluation offered by the DCS, the coercive intervention of the [c]ourt is necessary to compel [Mother] to engage in the needed treatment.

(Appellant's App. Vol. II, p. 112). On May 16, 2019, the trial court entered its CHINS disposition and parental participation order, ordering Mother to engage in and participate in a plan of services and programs to facilitate her reunification with the Child.

Mother now appeals. Additional information will be added if necessary.

## DISCUSSION AND DECISION

[12]     Mother contends that DCS failed to present sufficient evidence to demonstrate that Child is a CHINS. When reviewing a trial court's CHINS determination, we do not reweigh evidence or judge witness credibility. *In re S.D.*, 2 N.E.3d 1283, 1286 (Ind. 2014). Instead, we consider only the evidence that supports the trial court's decision and the reasonable inferences drawn therefrom. *Id.* When a trial court supplements a CHINS judgment with findings of fact and conclusions of law, we apply a two-tiered standard of review: we consider, first, whether the evidence supports the findings, and second, whether the findings support the judgment. *In re D.J.*, 68 N.E.3d 574, 577-78 (Ind. 2017). We will reverse a CHINS determination only of it was clearly erroneous. *Id.* A decision is clearly erroneous if the facts do not support the findings or if it applies the wrong legal standard to properly found facts. *Id.*

[13]     Here, Mother contends that the trial court erred in adjudicating Child to be a CHINS because there was no evidence that Child was seriously endangered by her "alleged status as a parent with mental health issues" and no evidence was presented that coercion was necessary to force Mother to obtain a psychiatric evaluation or mental health services. (Appellant's Br. p. 6).

[14]     The purpose of a CHINS inquiry is to determine whether a child's circumstances require services that are unlikely to be provided without the intervention of the court, and thus, the focus of a CHINS adjudication is on the condition of the child alone, not on the culpability of one or both parents. *In re*

*N.C.*, 72 N.E.3d 519, 524 (Ind. Ct. App. 2017). Nonetheless, "[n]ot every endangered child is a child in needs of services, permitting the State's *parens patriae* intrusion into the ordinary private sphere of the family." *In re S.D.*, 2 N.E.3d at 1287. Rather, a CHINS adjudication under Ind. Code § 31-34-1-1 requires proof of three basic elements: the parent's actions or inactions have seriously endangered the child; the child's needs are unmet; and "perhaps most critically," those needs are unlikely to be met unless the State intervenes." *Id.* It is the last element that guards against unwarranted State interference in the family life. *In re N.C.,* 72 N.E.3d at 524. State intrusion is warranted only when parents lack the ability to provide for their children. *Id.* Moreover, when determining whether a child is a CHINS under I.C. § 31-34-1-1, and particularly when determining whether the coercive intervention of the court is necessary, the trial court "should consider the family's condition not just when the case was filed, but also when it is heard." *In re S.D.,* 2 N.E.3d at 1290.

## I. *Mental Health*

[15]    In its adjudication, the trial court concluded that the Child's physical or mental condition was seriously imperiled due to Mother's severe mental health issues. Mother now maintains that the trial court's order was based on her "status as someone with alleged mental health issues," rather than on a serious threat or danger to the Child. (Appellant's Br. p. 9). As such, Mother asserts that DCS failed to present any evidence that she ever abused, injured, or neglected the Child. Focusing on facts submitted at the factfinding hearing, Mother contends that, at the time of the hearing, she was under the care of a psychiatrist, was

taking her medication, did not believe anyone was trying to kill her, and did not possess a weapon.

[16] Indiana has, historically, considered a parent's mental illness as an important factor in deciding whether that parent can meet the needs of their child, even while it consistently has held that mental illness, standing alone, is not a proper ground for termination. *See Egly v. Blackford Co. DPW*, 592 N.E.2d 1232 (Ind. 1992). This includes examining the parent's habits and patterns of conduct in addressing mental health problems and providing a safe, consistent, and nurturing residence and environment. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004). In the *Matter of K.P.G.*, 99 N.E.3d 677, 683 (Ind. Ct. App 2018), this court discussed the endangerment of a child by a parent's lack of treatment or insight about her mental illness. In *K.P.G.*, the child had a serious heart condition, Mother admitted she had an untreated mental illness, and the child displayed labored breathing. *Id*. at 684. The court noted that mother's untreated mental illness "left her unable to make critical decisions regarding [the child's] care and treatment." *Id*.

[17] In support of her argument, Mother points to *E.Y. v. Ind. Dept. of Child Servs.*, 93 N.E.3d 1141 (Ind. Ct. App. 2018) as an illustration of the appropriate analysis a court should undertake when a parent is alleged to have a mental illness. In *E.Y.*, evidence was presented that mother heard the voice of her former employer coming through the television set and a caseworker testified that Mother appeared to suffer from schizophrenia. *Id*. at 1146. We noted that DCS did not provide evidence Mother was ever diagnosed with or treated for a

mental illness and DCS did not refer Mother for a psychiatric evaluation. *Id*. Moreover, "DCS presented no evidence relevant to the impact, if any, of [m]other's mental illness on [c]hild's condition." *Id*. To the contrary, we noted that evidence was presented that Mother was meeting the child's needs. *Id*. Concluding that "DCS did not present evidence to support a reasonable inference that [m]other's mental illness impaired her ability to provide for [c]hild or that [c]hild was harmed as a result of [m]other's mental illness," we reversed the CHINS adjudication. *Id*. at 1148.

[18] We do not find *E.Y.* to be dispositive to the case at hand. "When determining CHINS status under Section 31-34-1-1, [], courts should consider the family's condition not just when the case was filed, but also when it is heard." *In re D.J.*, 68 N.E.3d 574, 580-81 (Ind. 2017). At DCS's initial involvement, Mother expressed her belief to FCM Cavazos that hitmen were going to kill her and the Child. She admitted to having been diagnosed with PTSD, anxiety, sleep disturbances, and Lupus. Testimony at the factfinding hearing disclosed that even though therapeutic meetings showed a promising start, Krogulecki "observed a significant shift in [Mother's] affect," resulting in a concern "that [Mother] is suffering from untreated psychosis which could cause her to have difficulty discerning what is real and what is not real." (Tr. p. 41). Although Mother's gun was confiscated by the police, she later obtained another gun, which she used to twice shoot her neighbor because she was upset with him as he had been making too much noise the night before. *See In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013) (A trial court may properly consider recent arrests

of a parent, especially when such pending criminal charges might subject the parent to "possible executed time which would necessarily interrupt reunification services" or have an impact on the "parent's ability to provide a safe and suitable home."), *reh'g denied.* Furthermore, Child had missed at least thirteen school days because Mother was convinced that a staff person at school was poisoning him. Accordingly, unlike in *E.Y.*, evidence was presented that Mother's actions, based on her delusions, endangered and negatively impacted the Child.

[19] Mother's untreated mental health concerns, her belief someone is out to kill her and the Child, coupled with her access to weapons and recent violent episode which resulted in aggravated battery charges, seriously endangered Child to the point his safety was being questioned and his educational needs were being neglected.[1]

## II. *Coercive Intervention*

[20] Mother also claims that the trial court's coercive intervention is unnecessary as Mother's testimony reflects a willingness to submit to a psychiatric evaluation. When determining whether coercive intervention is necessary, "the question is whether the parents must be coerced into providing or accepting necessary

---

[1] Mother also claims that she is protected under the American with Disabilities Act (ADA) as "DCS labelled Mother as severely mentally disabled" on insufficient evidence. (Appellant's Br. p. 11). Mother's protected status under the ADA as a disabled person is immaterial for the application of the CHINS statute as this statute focuses on the needs and safety of the Child, not on the status of the parent. *See* I.C. § 31-34-1-1.

treatment for their child." *Matter of E.K.,* 83 N.E.3d 1256, 1262 (Ind. Ct. App. 2017).

[21] At the factfinding hearing, Mother denied having a mental health diagnosis. She later testified that she was depressed and previously had been diagnosed with a form of PTSD. She noted that she had mental health assessments after the deaths of her three older children and that none of these assessments recommended further treatment. However, on the other hand, Mother also testified that she saw a psychiatrist who prescribed her anti-depressants to address anxiety attacks and to help her sleep. Although Mother told FCM Graybeal that she was willing to take a psychological evaluation, she informed the provider who contacted her to schedule the assessment that she no longer needed one.

[22] Mother's evasiveness about whether she has a mental illness, combined with her failure to complete an assessment—or any other DCS required services—before the factfinding hearing, is sufficient for the trial court to find by a preponderance of the evidence that its intervention is necessary to ensure the Child's safety and wellbeing.[2]

---

[2] Mother also claims that the involuntary commitment statutes address "the issues of mentally ill parents who are a danger to their children." (Appellant's Br. p. 14). However, the involuntary commitment statutes do not exclude the need for DCS to intervene on behalf of the child. Whereas the involuntary commitment statute focuses on protecting the public and ensuring the rights of the person whose liberty is at stake, the CHINS proceedings focus on the needs of the child and operate with the goal of giving family members the tools to learn how to provide and maintain a safe and suitable home environment for the child. *See Civil Commitment of T.K. v. Dept. of Veteran Affairs*, 27 N.E.3d 271, 273 (Ind. 2015); *In re N.E.*, 919 N.E.2d 102, 106 (Ind. 2010).

# CONCLUSION

Based on the foregoing, we conclude that the trial court did not err when it adjudicated Child to be a CHINS.

Affirmed.

Vaidik, C. J. and Bradford, J. concur